# CHARLESTON

## GOFF *v.* GOFF.

Submitted February 27, 1906.   Decided May 1, 1906.

1.  DIVORCE—*Cruel and Inhuman Treatment.*
    Such conduct and acts by a husband toward his wife, such treatment of her by him, as produces reasonable apprehension in her of personal violence, or produces. mental anguish, distress and sorrow, and renders co-habitation miserable, impairing, or likely to impair, the wife's health or mind, is cruel and inhuman treatment authorizing a divorce from bed and board under the Code of 1899, chapter 64, section 6, though there be no personal violence.   (p. 16.)

2.  SAME—*Permanent Alimony.*
    Permanent alimony decreed in a fixed annual sum, the defendant appearing in the case or served with process, is a personal decree and a lien on his land, though such alimony be payable in installments in the future.   (p. 21.)

3.  SAME.
    *Quaere.*  Can a court, in a divorce case, declare alimony a lien on specific land brought before the court in case the defendant is a non-resident, so that no personal decrees can be had, under section 11, chapter 64, Code of 1899?   (p. 21.)

4.  FRAUDULENT CONVEYANCE—*Deed—Marriage.*
    A voluntary conveyance made by a man under engagement to marry, made before and in contemplation of marriage, without the knowledge of the intended wife, with intent to free the land of the marital rights of the wife, is void as to her dower rights, and as to the alimony decreed against him in a suit for divorce.   (p. 23.)

Appeal from Circuit Court, Randolph County.

Bill by Louise L. Goff against Charles P. Goff for divorce. Decree for plaintiff.   Defendant appeals.

*Affirmed in part.   Reversed in part.*

ICE & ICE and W. B. MAXWELL, for appellant.
C. W. DAILEY and E. D. TALBOTT, for appellee.

BRANNON, JUDGE:

Louise L. Goff sued Charles P. Goff, her husband, in 1902, in the circuit court of Randolph county for a divorce *a mensa et thoro* on the ground of cruelty and inhuman treatment. The case came here on interlocutory orders, not material on this appeal.   54 W. Va. 364.   When the case went back to

the circuit court, Goff filed an amended answer charging a desertion by his wife of three years' duration, and asking that an absolute divorce be granted him. The case resulted in a decree giving the wife the divorce which she asked, allowing her $1,200 annually for alimony during the joint lives of the parties, and denying Goff the absolute divorce asked by his answer. Goff appeals.

I make from the great volume of evidence a summary of the material facts. Louise L. Schultz and Charles P. Goff when children lived and went to school together in Beverly, Randolph county, where a mutual attachment between them began. Miss Schultz's family removed from Beverly to Omaha, then to Albany, Oregon. Miss Schultz and her sister were engaged at $60 per month each in a large store in Oregon. The parties met later at Omaha and at Beverly, while she was visiting, and made an engagement to marry, which lasted several years. The parties with their friends met at Chicago, and were married 9th September, 1901. Goff took his wife to his home in Beverly at once. He was thirty-six and she thirty-five years of age when married. Goff's father died leaving a large personal and land estate, which he willed to his wife, which she increased, and she died without will, her entire estate passing to her only child, the defendant, Charles P. Goff. One Charles M. Kettle, a leading person in this unfortunate drama, when a boy of fifteen years, was taken into the home of Mrs. Goff, the mother of the defendant, and he made it his home. He is about twelve years the defendant's junior. After the death of Goff's mother, Kittle continued to live with Charles P. Goff in the family residence at Beverly. Kittle was maintained by Goff's mother and later by Goff. Kittle as Goff's best man was present at the wedding, and remained at his brother's in Chicago for some days after the wedding. He is frequently called "Charlie" in the record of this case. For ten days after Goff and his bride reached the family home in Beverly they lived happy; but Kittle came back and resumed his home with Goff, and from that moment began the unfortunate trouble between groom and bride. Goff and his wife occupied a room on the first floor, Kittle on the second. The very first night after Kittle's arrival Goff said to his wife that he would like to sleep with "Charlie." She thought

this strange, and objected; but she says he begged and pleaded so hard that she consented. The next night he roomed with his wife, and after retiring Goff told his wife that he thought so much of Kittle, and was bound to sleep with him at least once a week, that he would die if he did not, and if she wanted to make him happy, that was the only way in which she could do so, and wanted her to consent of her free will. He told her he was devoted to "Charlie," and wanted her to love him for his sake, and if she mistreated Charlie it would be the same as if she mistreated himself, and "it would be all off between you and I." A few days later he accused his wife of being jealous of Charlie, and when she would say anything about him, Goff would "cut her off." The wife was taken with diphtheria and was confined to her bed eight or ten days. He slept with Kittle while she was sick. He spent no time in her room, going in for a few minutes only with the doctor, showing her no care or attention, manifesting no solicitude. He claimed that he was afraid of catching the disease. While she thus lay he moved his wearing apparel little by little from his wife's room to Kittle's room, until none of his things were left in her room. After her recovery he slept with Kittle, never rooming with his wife, except when Kittle had a friend to lodge with him, which was rarely the case. She was left alone the only person sleeping on the first floor of the large building. She protested against this treatment; but he continued to lodge with Kittle. She says that he told her that if she objected to his going to Kittle's room "he would go now," and she says that he would not allow her to speak of his rooming with Kittle. She swears that her husband neglected her, never gave her a kind word, treated her only as housekeeper, gave her no authority in the house, found fault with her as to everything, caused servants to disobey her openly in their presence, telling them not to do so, countermanding her order in so small a thing as bringing a bucket of water, and humiliating her in their presence. She states that one night, at the close of her attack of diphtheria, when alone in her room, far in the night, when weak, miserable and sleepless, a dog barked, she became frightened, thought someone was trying to open the outside door of her room opening on the porch. She ran up stairs calling her sister, and stayed with

her. Goff and Kittle paid no attention to her, though she says she heard them walking on the floor above. The next morning at breakfast she narrated the occurrence, and both denied having heard her. She declared that she did not intend to sleep alone in that room any longer, as she was afraid. Goff became angry and said that she would have to do so, or go up stairs and stay with her sister. When hogs were slaughtered Goff told her that she must get to work with the meat. She told him that she was willing to do all she could, but had no experience with cutting up meat, rendering out lard and making sausage. She asked him if he and Kittle would not help. He said "No." He said she could hire her own help. She told him she was a stranger, did not know whom to get to help, but if he would get help she would do all she could, and he became angry, and told her she would do the work with the meat and had to do it, "and he acted perfectly horrible." She swears that she told him that she was willing to do anything and everything, if he would treat her kindly, but she could not stand "this kind of life." She says he did hire a colored woman, and she and the woman worked with the meat from nine in the morning till five in the afternoon; that he was in and out, but never noticed her, never spoke to her, but conversed pleasantly with the woman. She says he was always kind to servants, treating them better than he did her. Goff bossed the job, but did no work. Kittle was upstairs doing nothing. Goff scarcely denies this. The hired woman confirms Mrs. Goff's evidence. Says she thought strange of Goff's not speaking a word to his wife, especially as they were newly married. The day when the meat was saved, Goff and wife and sister were invited by a neighbor to dinner. She went, but Goff, angry because she said she could not work the meat alone, wrote a note declining the invitation. For several days, she says, Goff ignored and would not speak to her; but finally she spoke to him kindly and asked him why he so treated her, saying she had always been kind to him and tried to do her duty. He mentioned the dinner in the conversation, and said that he would not have gone to that dinner with her to save her soul from hell. They had a jar about a servant she had discharged for disrespect to her. She says Goff never spoke for a week, spending all his time upstairs with Kittle, ignoring her.

Shortly after when passing through the library where Goff was sitting, he requested her to sit down. She says she said to him that she was too unwell to talk on this subject then, but would soon do so. The next day she went to him in the library, and told him she could then talk with him. She says that she said, "Charlie, I can't stand this way of living any longer. You know that I have been perfectly devoted to you, and there isn't anything in the world that I would not do for you, and how have you treated me? You have brought me away from a good home where I have always been used to kindness, and you have treated me, abused me, worse than anyone in the house. You know that I have always done my duty, been good and kind to you, thinking in time you would be the same toward me. You took advantage of my kindness. The better I was to you, the worse you were to me. You have left me entirely and completely for Charley Kittle. He is the cause of all our trouble. You know it, I know it and he knows it. He has separated us, which I believe had been his intention all along or all the time. Although Charley Kittle has treated me very kind and I have been the same to him, you are so infatuated over him, he has so much power over you, that he has succeeded in turning you completely against me. I have always liked Charley Kittle until I saw and knew he was causing trouble between you and I. I said, now Charley you know I have been as good to Charley Kittle for your sake as his own sister would have been; but the way you have treated me, and knowing that it is his fault, my feelings have turned against him until I de spise him. There is only one thing to do,—he will have to leave the house. I cannot live this way any longer. Charley Kittle was away at that time. He was at Elkins at a ball. I asked Charley Goff when Charley Kittle would return. He said to-morrow. Then he (I) said when he comes back I want you to tell him to leave. If you don't I shall. The minute I spoke of Charley Kittle, and of his leaving, Charley Goff became perfectly wild and vowed that Charley Kittle should never leave as long as there was a breath of life in his body—meaning his own: He said I will never tell him to leave. I remarked, you have fully decided on that. He said, I have. Then I said, remember that I shall do so. Then he said he is liable to slap you in the face. I asked

during this conversation, What is Charley Kittle here for? He doesn't do anything. He seems to have a most wonderful influence over you, which I cannot understand. You are so infatuated over him that you are perfectly blind where he is concerned. I said, I can tell you what he is here for. He is after your money, as everyone knows. When that is gone your friend will go also. I said, I believe this is all I have to say on the subject at present; only one thing more, Charley Kittle must leave the house, for he has been the cause of all my trouble. As I went to leave the room, he said, You have fully made up your mind to tell Charley Kittle to leave. I said, I certainly have. And he remarked, You need never prepare another meal for me in this house. And as I left the room he said, Remember, we are not on speaking terms now." On another occasion he threatened to "beef" his wife. On another occasion he was eating breakfast as she passed through the room, when he called her a "damned thick headed Dutchman." Once when she called a servant boy to breakfast, Goff told her not to dare give Albert orders; then began to rave and swear and said before the servant that he had no more respect for her than for a dog, repeated it, and said "I want you to get out of here just as quick as you can. How any one can sit and eat at a man's table when they have been ordered to leave I can't see." Afterwards in an interview he repented of this, and begged her to give him one more trial. She answered that she would do so, and forget and forgive, asking only one thing, that he should give up Kittle, telling Goff that Kittle had caused all the trouble between them. She told him that he had admitted to her that he had married her as a convenience, but she wanted to give him another trial; but that he could not live with both Kittle and her; and he must choose between them. He replied that he could not part with Charlie. On another occasion, when Goff was sitting in the kitchen talking to the girl, his wife went in, but he did not notice her, and the phone rang to a call from Kittle at Elkins, and she went to the kitchen door and told him Kittle wanted to speak to him, and Goff said to her, "God damn you, go to hell, I haven't any use for you." Then after breakfast he went to her room, where her sister was, whom he admits he invited to his house, and swore and abused his wife, shook his fist in

her sister's face, and ordered her out of the house. The wife was crying. He shook his fist in his wife's face and said, "You get out of here, get your divorce, and get out of here as quick as you can," and cursed and abused her, and called her all sorts of names, saying over and over again, "Such a God damn woman." He said, "I will give everything I have to Charlie Kittle. I will deed this house and lot to him to-day." This is proven by a boy who was present. Goff admits it. His counsel do not question or deny his thus cursing and abusing his wife, but would apologize for it and say Goff afterwards repented of it. On 21st January, 1902, a little over four months from the marriage, Mrs. Goff left her home and went to the home of a neighbor in Beverly. Goff left Beverly 10th February, went to Cumberland, where he was shortly followed by Kittle, and they occupied the same bed there. Later both went to Chicago, where they still dwell together. Within twenty days before marriage Goff conveyed to Kittle a fourth share in a tract of 6606 acres of land, the fourth of the value of $33,000, it being the "Goff-Arnold land." Goff says he saw his wife several times after she left the house go in and out of the house. He does not say, nor is there any show, that he went to her, or said anything in repentance or friendship. It is proven that when she was packing her trunk in the house for final departure, some days after she went to the neighbor's, he knowing she had gone, he knew she was packing her trunk. He took no step toward her, spoke no word to her. Kittle was in the hall at her room during the packing of the trunk whistling, apparently in contempt, the tune, "There'll be a hot time in the old town to-night." Kittle gives evidence that Goff, as an explanation of his not rooming with his wife, made a statement too indecent to state. It is only mentioned as showing that Goff had no love, no respect, no regard for his wife. Why should he degrade her to a stranger? It bears on its face incredibility. So improbable, so unlikely! Who would believe it? It was inhuman and cruel to make the statement.

More of the matters appearing in the evidence of this regretable case might be given. Too much, perhaps, has been given. It is given as pertinent to an important legal question arising and contested in the case, that is, Does this sum-

mary of the case give the plaintiff a decree of separation under our statute, which grants such a decree "for cruel or inhuman treatment, (or) reasonable apprehension of bodily hurt?" Observe there is no violence to the wife's person. Once the law demanded this; but advancing civilization and right reason have changed the law. What is cruelty? "It has frequently been defined as actual personal violence, or conduct causing reasonable apprehension of it, or such a course of treatment as endangers life, limb or *health*, or renders cohabitation unsafe. * * * It is established in all jurisdictions, however, that mere want of congeniality or incompatibility of temper and the consequent wrangling of the parties will not justify a charge of cruelty on the part of either. Nor is jealousy or overbearing conduct on the part of the husband ground for divorce. The conduct of one of the parties must at least be such as to render cohabitation intolerable to the other; and although in some states actual bodily harm or apprehension thereof need not be shown, there must have been such treatment as so to destroy the peace of mind and happiness of the injured party as to endanger the health or utterly to defeat the legitimate objects of marriage." 14 Cyc. 599. "The rule that there must be personal violence, or apprehension of personal violence, has been changed in some states by enactments and decisions in effect overruling earlier cases. At present the great weight of English, Scotch and American authority is to the effect that any misconduct which tends to impair health, or which creates an appehension of bodily injury, is cruelty, although no personal violence was inflicted." 9 Am. & Eng. Enc. L. (2nd Ed.) 788. Nelson on Divorce and Separation, section 270, is to the same effect. On a statute in the same words as ours it was held in *Latham* v. *Latham*, 30 Grat. 307, that, "There may be cases in which the husband, without violence. actual or threatened, may make the marriage state impossible to be endured. There may be angry words, coarse and abusive language, humiliating insults and annoyances in all the forms that malice can suggest, which may as effectually endanger life and health, as personal violence, and which therefore would afford grounds for relief by the court; but what merely wounds the feelings, without being accompanied by bodily injury or actual menace, does not amount to legal

cruelty." To the same effect is *Myers* v. *Myers*, 83 Va. 806.
See *Reinhard* v. *Reinhard*, 65 Am. St. R. 66, and note.
There we see that neither actual violence, nor immediate dan-
ger of it, is absolutely essential. If the husband's treatment
be coarse, unnatural, abusive, so as to render life a misery,
prey on the wife's mind, produce mental anguish, impair her
nerves and endanger her *health*, it is enough. As Bishop-
says in his Marriage, Divorce and Separation, vol. 1, section
1547, we cannot say that mere mental anguish from mistreat-
ment is cause for divorce, because the courts have favored
the continuance of wedlock, no matter about mere unhappi-
ness, and have been disinclined to separate man and wife, ex-
cept for bodily violence, or well grounded fear of it, and
under the rule of *stare decisis* we cannot say that mere un-
happiness, mental suffering, is ground. Bishop, section
1551, justly criticises the logic of this position of life long
continuance of misery, quoting from *Rice* v. *Rice*, 6 Ind.
105, "If it be true that we are possessed of social, moral and
intellectual natures, with wants to be supplied, with suscepti-
bilities of pain and pleasure; if they can be wounded and
healed, as well as the physical part, with accompanying suf-
fering and delight,—then we think that conduct which pro-
duces perpetual social sorrow, although physicial food be not
withheld, may well be classed as cruel, and entitle the suf-
ferer to relief. And in point of fact we have no doubt that
mere cold neglect has sent broken-hearted to the grave hun-
dreds of wives, where the dagger, poison, and purposed star-
vation has sent one. Men generally supply a sufficiency of
food to their brute animals." In sections 1552, 1561, 1562,
1563, he says that an escape from this unreasonable rule is,
that wherever this mental anguish produces, or is liable to
produce, ill health, cruelty exists calling for divorce. The
science of physiology tells that continued mental pain will
wreck health. We almost take judicial notice of this fact.
It requires no science to tell us this. In this case we have
ground for reasonable fear of bodily harm. Goff shook his fist
in his wife's face, and threatened to "beef" her. Did not this
mean to slaughter her? And in the paroxisms of anger,
which the evidence shows would come over him, was there
not reason to fear personal violence? And then that awful
abuse. What woman's nerves could stand it? What anguish

2

of heart would it not produce? Must a frail woman submit to it through life? How long would life last? All the books say that if it tear down, or endanger, *health* it is cruelty. Mrs. Goff says and proves that it greatly injured her health. She was healthy before marriage. During those troubles she had headache, nervous prostration, sleeplessness and loss of appetite. And add to the abusive language the abandonment of cohabitation; the husband's refusing to room with his wife, and betaking himself to the bed of Kittle, and giving his heart and soul and estate to him; and declaring that he would give Kittle his home and lands, as he had already done in the conveyance of real estate, just before the wedding, worth $33,000; which might leave the wife without support. Could a woman be in a more lamentable condition? Is this not cruelty? And our statute means to do something by using not only the word "cruel," but also "inhuman." And notice the word "treatment" in our statute. Does it, in connection with the adjective "inhuman," mean more than "cruelty" as used in the books? It may. It is not necessary in this case to say. But it certainly goes to render easily applicable the doctrine that bad treatment telling on health comes under it, if mere enduring sorrow and mental pain do not. Clearly the wife's divorce is justified under the words of the statute, "cruel or inhuman treatment." It is not necessary to inquire whether she is entitled to a divorce for abandonment or desertion.

The defense, admitting Goff's wrong, seeks to show that he sought and offered reconciliation. I do not follow the many facts bearing on this question. I dismiss it with the declaration that the evidence clearly shows that Goff soon tired of his marriage under some strange influence, which his wife and even Goff's kin attribute to Kittle. Under oath he swears she loved him, but he could not love her. He told a witness there was no chance of reconciliation. Goff wanted to get rid of his wife, for no earthly reason, so far as the evidence tells; for she seems to stand before the court with fair character, conduct and amiable disposition, having performed her full duty in her short married life. Every show of a desire for reconciliation on Goff's part was met with entire assent by the wife; but he never made any show that was not insincere and designed to put his wife in the wrong. He left

the state. He wrote a note to his wife saying he would dismiss Kittle, if she would return, and asking her return. This is greatly relied on in defence. But was it sincere? That note required an answer by four o'clock that same day. The wife received it only about one o'clock. She wrote asking a short time to reflect. He got up before day next morning, drove seven miles to catch a seven o'clock train for Cumberland, though by waiting till noon next day he would get a train. He says he had no pressing demand to hasten. But several days before, as he admits, he had made up his mind to go. Had sent Kittle to Elkins to draw $3,500 from bank, and he purchased a New York draft for $3,000. If sincere, if desiring reconciliation, why not wait a few hours anyhow? He left when reconciliation was pending. Must we not say that he did not desire it? A request to return must be in good faith. *Alkire* v. *Alkire*, 33 W. Va. 517. And we must note that when Goff wrote that note he was in consultation, at his house, with an attorney from Elkins. The attorney saw the note. Was it a design of Goff's to put his wife in fault? Friends later tried to persuade him to put Kittle away. He refused. Friends tried to get them to meet. She told them she was ready; that she must have a personal meeting. This was reasonable. A friend fixed · Oakland, Grafton, his house, for a meeting of reconciliation. Goff would not go. He declined to meet his wife. He said he must act by attorneys. What had attorneys to do with the confidential, sacred negotiation of estranged husband and wife for reconciliation? If sincere, he would want no stranger intermediary. This very refusal of interview, and wanting to treat only through counsel, affords a fair inference that desire of re-union is not sincere. 1 Nelson on Divorce, section 74. When she wrote him affectionately, even after suit, begging him to eliminate Kittle as the only apple of discord, and promising, on that one condition, love and devotion, he answered that as she was going on with her depositions ''no reply was necessary.'' She had only said her letter should not compromise her in her suit, if he would not return. He added that he would consider ''seriously what course I will now pursue. I will let you know.'' He never let her know. He would not meet her as friends suggested. Kittle himself proves this. So he never intended or sincerely tried to bring

about reunion. But really, after once she had by cruelty been driven from house and home, she was under no obligation of reconciliation. How long would it last? By the evidence it would be a frail reliance. If it could, as it cannot, be said she declined reconciliation, it is no bar to her. 1 Nelson on Divorce, section 73.

Much is said by counsel against Mrs. Goff to the effect that her aim was only money, not reconcilement; that she demanded, as a condition, $20,000. It is not proven. Goff had as much hand in this money settlement as she, and more; for the evidence shows, that to get rid of his wife, he was willing to pay $10,000. But suppose that she, after months of bad treatment; after Goff had refused to put off Kittle; after he had given him a costly diamond ring and realty valued, as agreed facts show, at $33,000; when from the past she was without hope for the future of the marriage; she, a wife without home or estate, being poor; suppose she did ask money. The fact cannot impeach her. It was her legal right. When Goff married her, did he not, in law and fact, promise her home and support? By agreed facts he had estate worth $85,000, with great prospective value from real estate in the development of that section, besides the $33,000 worth of land given Kittle. Was the wife's demand, if she made it, illegal or unfair?

Mrs. Goff did demand that Kittle be eliminated from the home. That might seem an unreasonable condition by some. We do not so regard it. There is not one young wife in one thousand that would not have done the same under the circumstances stated above. The mass of evidence shows that Kittle was the wedge that divided these people, and would continue to do so. Relatives of Goff so looked upon the trouble. Why should Goff, of family most prominent in all that section, who had spent three years at the West Virginia University, and wealthy, be bound in the toils of this young man of twenty-four years? What the bond of union binding these men together? A bond that broke the link of marriage between persons in the thirties when the honeymoon was scarcely gone? A bond that induced Goff to convey away from himself and his engaged wife and prospective children, only twenty days before marriage, real estate then valued at $33,000, and now, with the coal

being brought out of its bowels in the great development of Randolph county, a princely fortune? A bond which induced Goff to salary Kittle without service and clothe him "in purple and linen?" A bond which induced Goff to give to Kittle a precious ring set with jewels owned by his dead father and mother who had conferred so much upon him, which would be sacred beyond money to most men? A bond which induced Goff to bear insult from Kittle with composure? A bond which induced Goff to be a servile menial to patch Kittle's pantaloons and wash his socks? What was this bond? It was weird and potent, stronger than steel. It made them as close as Damon and Pythias. Its grasp unyielding. He was

"Like a poor prisoner in his twisted gyves."
"His very will seems to be in bonds and shackles."

It follows from what has already been said that Goff was properly denied a divorce. He demanded that his wife leave his table and bed.

As to the claim that $1,200 annual alimony is too much. We so conclude. We do not deny that the amount of alimony is in the discretion of the court; but we as well know that it must be based on income. *Heninger* v. *Heninger*, 90 Va. 271. It is for the wife's support, not the husband's punishment. Of the $85,000 value of Goff's estate, $48,000 is unproductive realty. He has to live. Everything cannot be taken from him. He has to pay taxes. The interests of the plaintiff demand that they be paid. His income must be rated at $1,800. We have considered this matter seriously and have concluded to reduce the alimony from $1,200 to $1,000 per annum.

The decree declared the alimony a lien "on all the real estate owned by defendant Goff." The decree made the future alimony payable quarterly. It is said by counsel that the strong weight of authority seems to be that future payments are not a lien, citing 2 Am. & Eng. Ency. L. (2d Ed.) 132, 3–4. It may be so in some states. It is clear, as stated in that volume, that a pending suit for divorce and alimony is not in itself a lien. But how is it after the decree for alimony? We are cited to 14 Cyc. 783, for the proposition that a decree for permanent alimony does not become a lien, unless so

provided by statute, and the jurisdiction of equity cannot authorize'the creation of such lien. But much authority is cited in 2 Am. & Eng. Ency. L. (2d Ed.), to show that a decree is no lien unless the decree fixes it on specific property brought before the court. But it is there asserted that the court may so declare a lien. No particular property is before the court or subjected by the decree. The decree declares a general lien. The decree adjudges Goff to pay fixed sums at fixed times in future. Our Code says that "every judgment for money rendered in this State heretofore or hereafter against a person shall be a lien on *all* real estate of or to which such person shall be entitled at or after the date of such judgment." Does the fact that payment is to be made in future change the matter? Why should it? Here is a final adjudication of present liability, only it is to be discharged in future. Of course, a decree for a gross sum as alimony is a lien by the letter of the statute. *Renick* v. *Ludington*, 14 W. Va. 367. The lien of alimony recovery is discussed in *Conrad* v. *Everich*, 40 Am. St. R. 679. By reason of our statute making "every judgment" a general lien on all the defendant's land, there need be no specified property charged by the decree. The only question is whether future installments are a lien. We think they are. Should the door be left open so that Goff might by conveyance dispose of his property and wholly defeat his wife's alimony? She has, by law, right to look to her husband's estate for reasonable support. The law shares the property, to the extent of alimony, between them. He has exiled himself from the state voluntarily. According to *Holmes* v. *Holmes*, 29 N. J. Eq. 9, non-residence gives a court power to make the alimony a lien. As the decree is by law a lien without the decree's so saying, its declaring it such is not error.

A glance at section 11, chapter 61 of the Code, tells us that the powers of the court are broad in making, in addition to the divorce, "such further decree as it shall deem expedient concerning the estate and maintenance of the parties." Under the view above taken, it is unnecessary to say whether or no the inherent powers of a court of equity in divorce cases would not under that section alone authorize a court to decree the future alimony a lien, a power exercised in many states. Where a non-resident has estate here, but not served

with process so as to enable the court to render a personal decree constituting a lien, and where no attachment is sued out can a lien be declared? If the bill brings specific property before the court and asks the court to declare alimony a lien on it, cannot the court do so? It is done in many states. It seems to be a power in divorce cases under authority cited above. But as the bills bring no specific real estate into the case, except the land conveyed to Kittle, we cannot properly say what we could do, in a proper case, under section 11.

Complaint is made that the plaintiff was not charged with rent of house and with some provisions consumed and furniture used by her pending suit and sold cows. She was in possession by order of the court as receiver. She took care of the property and furniture. Her occupation was before the alimony began, and it being found that her husband was in the wrong, not she, her right of support, pending suit would excuse her from payment of rent for house and furniture. If she sold property, that is an open matter not involved here.

We cannot sustain the complaint against the decree that it allows the plaintiff costs. The claim is that defendant had once paid such costs in the interlocutory order compelling him to pay $500 for expenses and attorneys' fees. That allowance was not for the taxable costs. The order so shows.

### CROSS-ERROR.

Appellee cross-assigns error in the refusal of the court to cancel the deed mentioned above from Goff to Kittle for a fourth interest in a tract of 6,606 acres of land, which fourth, as shown by the agreement of facts, was then of the value of $33,000. It dates 20th August, 1901, and was recorded 18th November, 1901. When made the intended wife was far from Beverly where it was made, knew nothing of it, and she says first learned of it by noticing it in a newspaper. Goff never told her of it, as she says. He proposed to put in the deed a consideration of love and affection; but as Kittle was not kin to him, counsel told him this would not do. Counsel advised him against making the deed, but he persisted. The deed states the consideration as "personal services heretofore rendered me and to be rendered me during

a contemplated trip and return to Beverly." This trip was going to Goff's wedding, all expenses being paid by Goff. Being to the great city of Chicago it was a pleasure trip. Does a bridegroom pay his best man at the wedding? As to past services Goff and Kittle both say that Kittle was on a salary and it had been paid by Goff. In conversation with Phillips Goff did not pretend a real consideration. He said that he had told the attorney to make the deed state a consideration of love and affection, and blamed him later for not so doing. He declared he wanted to make provision for Kittle and would convey this land to him. He admitted that he was careful to convey to Kittle *before marriage*. He says he did so in pursuance of a request of his mother. He said he had provided for Kittle in his will. (Was this more property?) When asked what services Kittle had rendered for which he had not been paid he replied "I do not know that I can say." When asked if Kittle *had* rendered service for which he had not been paid, his reply was, "I cannot say he had." Kittle swears that he never requested Goff to make the deed. Thus we have a great estate conveyed without consideration, in secret from the wife, in contemplation of a marriage, under a promise of marriage made long before and executed a few days after the deed. The bill attacks it as made in fraud of the wife's rights. Of course, on the facts stated in the bill the wife had, upon marriage, a contingent dower, and upon the occurrence of cause of divorce she by law had a demand for alimony. In *Waller* v. *Armstead*, 2 Leigh 11, the rule is stated, that deeds made by a woman giving her property just before marriage, without the knowledge of the intended husband, are void as to him. In *Gregory* v. *Winston*, 23 Grat. 102, is a discussion of such conveyances by the woman. The rule is stated that it depends on the circumstances. If the conveyance be *bona fide*, free of bad intent, or for value, it is good. In that very valuable late work, Am. & Eng. Decisions in Equity, volume 3, 525, a great many cases are cited on the subject of "Fraud on Alimony." The case of *Bonslough* v. *Bonslough*, 68 Pa. St. 495, is cited saying that "there is no reason why a wife whose husband has deserted her and refused to perform the duty of maintenance, or who by cruel treatment has compelled her to leave his house, and commence proceedings for

divorce, should not be viewed as a *quasi* creditor in relation to the alimony which the law awards her." There it is laid down, on many authorities, that any such conveyance or disposition of the husband's property is void as to her, in the hands of a voluntary purchaser, or purchaser with notice. "A judgment or decree awarding alimony to the wife is sufficient to establish her rights as a creditor of the husband to impeach a conveyance made by him with intent to defraud her of alimony." 14 Cyc. 798. As to dower this rule is established. A voluntary conveyance just before marriage with intent to defraud dower is void. *Thayer* v. *Thayer*, 39 Am. Dec, 211, and full note; Scribner on Dower, 588. Is it said that no alimony right, or cause for it, existed when the deed was made? Neither did inchoate dower exist. Both are future and contingent. There is no difference between them in this matter. I would assert that when a man marries a woman the law gives her home and support at his expense. Such are his contract and liability. So the law gives dower. Now, if he gives cause of divorce, alimony is given by law. Dower does not come till death of the husband; but right of support or alimony comes at once on marriage, and is a stronger claim than dower. The law from the instant of marriage says that if there shall fall a cause for alimony, it shall be given. Is this sustained by law as it is by justice? Dower is protected against fraudulent transfer—so is alimony. 14 Am. & Eng. Ency. L. (2d Ed.) 252. There we find both assimilated. "A right to alimony is incident to divorce and consequent upon it, and a wife having cause for divorce, though not in strict language a creditor of her husband, stands to him in the relation of a creditor, having an inchoate right of payment of whatever alimony may thereafter be decreed her, and is consequently within the statute." "Alienations of real property by a man about to be married, made without the knowledge of his intended bride, and with the intent and object of depriving her of the rights which she would otherwise acquire in his property by the marriage, may be avoided by the wife as fraudulent." Wait on Fraud. Conveyance, section 314. It was Goff's duty to inform the wife of this conveyance. Had she for herself and prospective children no right in it? Bigelow on Fraud, 610, 611. *Leach* v. *Duval*, 8 Bush 201, holds a conveyance of a valua-

ble portion of the husband's estate, just before marriage, without the woman's knowledge, a fraud on her right. But it is said no cause of alimony existed when the deed was made. There is no difference, as there was an engagement, which if carried out would invest rights. A conveyance to defraud future creditors is void. Under a statute avoiding conveyances "made with intent to hinder, delay and defraud creditors or other persons of lawful suits and demands, a wife may maintain a suit to set aside a conveyance by her husband, made with such fraudulent intent, so as to enable her to collect alimony awarded in a divorce suit against him, though the cause for such divorce did not arise until after the conveyance." *Gregory* v. *Filbeck*, 12 Colo. 379. Our Code, chapter 74, section 1, avoids acts to defraud "creditors, purchasers or other persons of or from what they are or may be lawfully entitled to." Very broad. Think of a gift of $33,000, just before marriage, to one having such unlimited influence over the grantor. What could have been the intent except to get it out of the legal right of the intended wife? If Goff's mother did request it, why did he wait for two years until just before marriage? But the plaintiff has no right to annul the deed *in toto*. It is good between Goff and Kittle. We hold it void, as if never made, as to the alimony and the dower of the plaintiff, should it ever become consummate. The alimony is a lien on the realty so conveyed to Kittle.

We reverse as to that feature of the decree refusing plaintiff relief as to the conveyance to Kittle, and modify it as to the amount of alimony, and in other respects affirm.

*Reversed in part.    Affirmed in part.*