# CHARLESTON.

REYNOLDS *v.* REYNOLDS.

Submitted September 7, 1909.  Decided October 25, 1910.

1. DIVORCE—*Desertion—Sufficiency of Evidence.*
   To justify a decree of divorce on the ground of desertion or abandonment without justifiable cause, the evidence thereof must be full and clear.

2. SAME—*Desertion—Evidence.*
   Desertion cannot be inferred from the fact that the parties do not live or cohabit together.

3. SAME—*Desertion—"Justifiable Cause."*
   Justifiable cause, which will excuse a husband or wife, from leaving the other, must be such as could be made the foundation of a divorce from bed and board.

4. SAME.
   The conduct of the one party, which will justify desertion by the other, must be of such a nature as is inconsistent with the marital relations, or to render cohabitation unsafe.

68 W. Va.

5. Same—*Desertion—Justifiable Cause—Evidence.*
   A case in which the facts proven were held to be insufficient to constitute good grounds of desertion.

6. Same—*Desertion—Justifiable Cause—Refusal of Sexual Intercourse.*
   Neither the refusal of sexual intercourse, nor the fact that the parties occupy separate houses or apartments, will alone constitute good grounds for desertion.

7. Same—*From Bed and Board—Permanent Alimony.*
   It is error for a court, upon decreeing a divorce from bed and board, to vest the title to the husband's real estate in fee in the wife as permanent alimony, unless there be special circumstances calling for such decree.

8. Same—*Permanent Alimony—Property Subject.*
   The general rule is that the income of the husband, whether derived or to be derived from his personal exertions, or from permanent property, or from both, is the fund from which alimony is derived, and from which there should be a personal decree, the amount to be determined by the circumstances of each particular case.

Appeal from Circuit Court, Wood County.

Action by Emma F. Reynolds against William O. Reynolds. Decree for plaintiff, and defendant appeals.

*Affirmed in part. Reversed in part. Remanded.*

*J. F. Laird,* for appellant.

*Thomas Coleman, E. L. Coleman,* and *W. H. Wolfe, Jr.,* for appellee.

Miller, Judge:

The plaintiff, for alleged desertion of her by defendant, sought a decree of divorce *a mensa et thoro,* and, the custody of her infant daughter, and that the interest, being the one-fourth undivided interest of her husband, in a certain lot in the city of Parkersburg, be transferred to her as permanent alimony, and general relief. An attachment for $2,000.00, the approximate value of said lot, as alleged in the bill, was also sued out and levied by the sheriff thereon.

The original decree pronounced December 20, 1907, in accordance with the prayer of the bill, adjudged that plaintiff and defendant be and they were thereby divorced from bed and

board, and the care and custody of their infant daughter, Marion Freda, was given the plaintiff. And the court being of the opinion that the interest of defendant in said house and lot was a reasonable amount for her alimony and the support and maintenance of said infant, it was further decreed that plaintiff have conveyed to her as permanent alimony said one-fourth undivided interest in fee simple; and on January 7, 1908, as the record shows, a deed therefor was made, executed and delivered to plaintiff by a commissioner appointed for that purpose.

On April 25, 1908, at a special term of the circuit court, defendant appeared openly, and on his petition, subsequently amended, and bond for costs filed, as provided by section 14, chapter 124, and section 25, chapter 106, Code 1906, the cause was reinstated on the docket, and petitioner permitted to make defense.

On December 30, 1908, the cause was brought on again to be heard on the papers and proceedings filed at the date of the original decree, and upon the answer and cross bill of defendant, depositions and proofs taken, the demurrer of plaintiff to said answer and cross bill, previously overruled, the demurrer of Thomas Coleman thereto, previously sustained, but amended as to him and not demurred to as amended, and the court being of opinion that defendant was not entitled to the relief prayed for in his answer, it was thereupon again adjudged, ordered and decreed, in accordance with section 26, chapter 106, Code 1906, that the prayer of defendant's cross-bill answer be denied, and that the decree entered in said cause, December 20, 1907, be ratified and confirmed, and that plaintiff and Thomas Coleman recover of defendant and John F. Laird, surety, their costs.

It is from the decree of December 30, 1908, so ratifying and confirming the original decree of December 20, 1907, that this appeal is prosecuted.

Three questions are presented for decision: First, was plaintiff, on the record as finally presented, entitled to a divorce from bed and board? Second, and if divorce was properly decreed did the court err in decreeing that the interest of defendant in said house and lot be conveyed to plaintiff as permanent alimony? And, third, if plaintiff was not entitled to the relief prayed for and decreed her, was defendant in his cross-bill answer entitled to a decree of divorce from bed and board as

prayed for therein? Of course if we affirm the first proposition, we would necessarily negative the third, for both parties could not be entitled to a divorce. *Wass* v. *Wass,* 41 W. Va. 126.

Defendant denies the charge of willful abandonment. He does not deny that he absented himself from home at or about the times charged in the bill, but alleges as good cause therefor, cruel and inhuman treatment by plaintiff. The acts and conduct of plaintiff mainly relied on are, that in December, 1903, on going to his home, plaintiff assaulted him without cause, with a pair of scissors, and ordered him away; that in 1904, on returning home, she refused him a bed, and all martial rights; also prior neglect to visit him in the hospital, and to administer to his wants and necessities in time of sickness, and other causes, all of which are relied on and charged' against her in his cross-bill answer as ground for affirmative relief.

The record shows that these parties 'were married in 1874; that three children were born to them, the oldest now about thirty years, and the youngest about ten years of age; that almost from the beginning their relations became strained, and have so continued to the present; then at one time after the birth of the first child, plaintiff absented herself from defend-ant, leaving the child, and was gone for several months, her excuse given being that nothing was furnished her to eat; that on several occasions defendant absented himself and was gone out of the State for months, the last time, before the institution of this suit, for about a year; that he had not cohabited 'with plaintiff since December, 1903, but continued to provide for her, to some extent at least, until he left the State in December, 1906, and thereafter ceased to make any provision for the maintenance of his wife or infant daughter.

To establish her right to the decree the burden was upon the plaintiff to show wilful desertion or abandonment of her by defendant, without justifiable cause, and the evidence thereof must be full and clear. *Tillis* v. *Tillis,* 55 W. Va. 198 (46 S. E. 926) ; *Burk* v. *Burk,* 21 W. Va. 445; *Bailey* v. *Bailey,* 21 Grat. 43; *Carr* v. *Carr,* 22 Grat. 168. Desertion can not be inferred from the fact that the parties do not live together. *Burk* v. *Burk* and *Bailey* v. *Bailey, supra.* Defendant does not deny, but admits, absence from, but alleged continued support of defendant and daughter after December, 1903, and absence

without support since August, 1906. Justifiable cause which will excuse a husband or wife from leaving the other must be such as could be made the foundation of a judicial proceeding for divorce *a mensa et thoro. Alkire* v. *Alkire,* 33 W. Va. 517 (11 S. E. 11) ; *Martin* v. *Martin* 33 W. Va. 695 (11 S. E. 12) ; *Carr* v. *Carr,* 22 Grat. 168; *Harris* v. *Harris,* 31 Grat. 13. But the conduct of one party to justify the other in leaving must be of such a nature as to be inconsistent with the martial relation, or to render cohabitation unsafe. Keezer on Marriage and Divorce, section 142, and cases cited in note. The question then remains, was his desertion or abandonment justifiable in law, so as to deprive plaintiff of the right to a decree of divorce?

The first and foremost fact relied on by defendant is that in December, 1903, when he went to his home, or the place where his wife and child resided, she assaulted him, without cause, with a pair of scissors, and ordered him to get out. There were three witnesses to this transaction, the plaintiff, the defendant, and a nearby neighbor. This is a very important factor in the case, for here is where the final breaking off of all marriage relations appears to have begun. Referring to this time, defendant says: "I walked in the house and had begun to let the ashes out of the grate and my little daughter laid her breast across me and my wife jumped up with a pair of scissors and I backed out of the room and she told me to go out of there, and I said Mrs. Reynolds, I will go out but it will be a long time before I come back and she went out and called the police. * * * * She did not strike me exactly, but she came at me holding the scissors in front of her and I backed out of the door in front of the scissors. * * * * She followed." He further testified his belief that she would have struck him with the scissors if he had not backed out; that he never afterwards returned to his wife's home to live; that he was unable thereafter to live or cohabit with her, because she was quarrelsome and abusive every time he went home; that she was a woman of very high temper, and when she exhibited her temper towards him, he would try to reason with her, and he would sometimes tell her that was no way for her to act, and would walk away and leave her. M. G. Neale, a neighbor, who witnessed, in part, the occurrence in December, 1903, testified that he walked out on the front porch and heard

Mrs. Reynolds call for the police; that about that time Mr. Reynolds came out, and she told him to go and stay and not come back again; that Reynolds replied that when he went he would be gone a long while. The testimony of Mrs. Reynolds, respecting this occurrence, was, that when defendant came up to the house he said: "Where's babe?" and then sat down awhile; that she was sitting at the stand and was sewing, when he commenced fussing about Frank; that she had the scissors in her hand and said: "Here, now, leave Frank alone; you are always fussing about Frank"; that Frank was in the hospital at the time; that defendant sat there awhile, and pretty soon got up and acted like he was going to hit her, and that she then ran out and "hollered, murder"; that he then got up to go out, and she said "get out", but meant for him to leave her alone; that she did not call the police, but "hollered murder"; and that she did not in any way attempt to strike or stick her husband with the scissors. She furthermore says, that defendant was at liberty to· come home after this incident, if he wanted to; that nobody drove him away; that she at no time ordered him to leave home. On cross examination she admitted that defendant never offered to hit or assault her in any way, but she thought or was afraid he ·was going to do so.

To the facts connected with this incident, defendant would link some prior and subsequent conduct of plaintiff towards him, notably, that some time prior, while residing at the same place, date not given, he was taken sick, and a doctor was called in; that he called for a drink of water, which he needed very much, and heard his wife say that she would not take him a drink of water if he was dying. This fact is denied by plaintiff, but defendant is corroborated by the doctor, but the doctor fixes the time in May, 1900. At another time, in 1903, defendant broke his leg, and was taken to the City hospital, four or five blocks from his residence, where he remained about four weeks. He says, his wife never visited him there, or did anything towards nursing or caring for him. Plaintiff admits this, but says as a reason for it: "I did not think I ought to, the way he treated me."

Another incident occurred at the home, in February, 1904 or 1905, and is much relied on. Defendant went there, apparently to renew cohabitation, but was not there more than

twenty minutes, he says, when he told plaintiff that he .wanted to. stay all night, and she replied they had no bed for him, and he said all right. He states that she then said she would have nothing more to do with him; that all he wanted was to. give her trouble—but still she wanted him to support her; that she refused to discharge her wifely duties towards him, and refused to cohabit with him as long as a year and a half at a time; that she said she would have nothing to do with him, and when he would be down town and would go home she would say she would have nothing to do with a man who wanted to sleep with a woman all the time; that a man who wanted to sleep with a woman all the time was a brute.

Plaintiff denies these charges; denies that she denied defendant a bed, says that there were plenty of beds in the house, but even if there were no beds, there was a lounge. She says the house was always open for him to come in and stay at night, and live with her when he so desired; that when he would go out she would shut the door.

The only other fact of importance relied on as cause for desertion was the treatment of defendant by his eldest son, Frank. He frequently quarrelled with his father, as he says, because his father failed to provide properly for his mother and sister. At one time while defendant was delivering a load of coal at the house, he threatened if his father would come down off the wagon he would whip him. Defendant says this was in the presence of plaintiff and encouraged by her. She denies it, but on the contrary she says she always told him to treat his father right.

That there was indifference, if not positive neglect by plaintiff of her martial duties and obligations to defendant for many years, the evidence, including her own admissions, leaves little room for doubt. Defendant is proven to have been a hard working, sober, industrious and peaceable man. He evidently did not have large earning capacities; but he seems to have struggled hard to get along, and although he evidently did not provide very bountifully for his family, he had little to encourage him to do so, but seems for the greater part of the time to have done the best he was capable of doing, particularly the last two years before he left them. He was a common teamster, earning when driving teams for others, about nine dollars per week.

Has defendant made out a case justifying his desertion and abandonment? The decree of the court below was that he had not. We are unable to say its decree was erroneous. The evidence of plaintiff's actions and conduct toward him is not sufficient we think to bring the case within the rules laid down in the authorities cited. That the parties quarreled in 1903, is admitted, but, it is not clearly shown that plaintiff by violence or otherwise drove defendant away, or consented to his absence. Defendant admits subsequent support, and his return to the home in 1904, or 1905, and plaintiff denies any refusal to cohabit with him. Sower's Appeal, 89 Pa. St. 173; *Cornish* v. *Cornish,* 23 N. J. Eq. 208. Refusal of sexual intercourse is suggested. This, if without sufficient reason, is wrong; but it is not good ground for desertion, as cruel and inhuman treatment. *Fritz* v. *Fritz,* (Ill.) 14 L. R. A. 685, citing, among other cases, *Reid* v. *Reid,* 21 N. J. Eq. 331; *Southwick* v. *Southwick,* 97 Mass. 327. It is said in 14 Cyc. 612, that this is the weight of authority. Occupation of separate apartments is not desertion. *Throckmorton* v. *Throckmorton,* (Va.) 11 S. E. 289; *Reed* v. *Reed,* (Ark.) 37 S. W. 230. We are of opinion, therefore, to affirm the decree divorcing the parties from bed and board.

Responding now to the second question presented for decision, we are of opinion that the court below erred in decreeing that the interest of defendant in said house and lot be conveyed to plaintiff as permanent alimony. It is undeniably true that in some states in the absence of statutory authority, in others where statutory power is given, the courts, on decreeing divorce, have asserted the right to vest title to the husband's property in the wife as permanent alimony. A number of these cases are cited and relied on by counsel to sustain the decree here; notably the cases from Nevada. We will not take time to review these cases. They are all collated in a note to *Cizek* v. *Cizek,* a Nebraska case, reported in 5 Am. & Eng. Anno. Cases, 464, 469. In another case note to *Kerr* v. *Kerr,* (Pa.) 9 Am. & Eng. Anno Cases, 89, 90, the cases upon the subject making a decree for alimony a lien on realty, under statutes, and in the absence of statutes, including our case of *Goff* v. *Goff,* 60 W. Va. 9 (53 S. E. 769), are reviewed and discussed. In the note to the first case, the annotator says: "Though there is conflict of au-

thority, the majority rule seems to be that a court, ordinarily, in the absence of statutory authority, has no power, upon decreeing a divorce, to vest the title to the husband's property in the wife as alimony." Citing, among the cases, supporting this proposition, *Almond* v. *Almond,* 4 Rand. (Va.) 662. According to some decisions, referred to in this note, courts, without statutory power, have under special circumstances decreed that title to real estate vested in the husband be transferred to the wife; as for example, when the property was obtained with the wife's money, or by her labor or exertion. But the better rule, according to the authorities, says this annotator, is to give the wife an annual allowance, or life estate in the realty, instead of decreeing her the realty in fee. In *Almond* v. *Almond,* Judge Carr says: "Now, the claim of the wife for alimony is a personal claim on the husband; she has no lien on any specific property, without an agreement. She can no more, therefore, ask the court to assign her this negro, or *that tract of land,* than a creditor of the husband could come into court and ask such assignment; which we know, without a particular lien, could not be done." So far as we can find there was no statute in Virginia at the time of this decision, (July, 1826) relating to the subject of alimony. The first statute we find on the subject is section 4, chapter 122, Acts of Assembly, 1848, providing: "That in granting divorces under this act, the court shall have full power to *decree perpetual protection to the person and property of the parties, and to decree to either, out of the property of the other, such maintenance as may seem proper,* to restore to the injured party, as far as practicable, the rights of property conferred by the marriage on the other, and so to dispose of the custody and guardianship, and provide for the maintenance of the issue, as, under all the circumstances, may seem right." No specific authority is here found for the transfer of the fee in the land by way of alimony. Section 11, chapter 64, Code 1906, except the last clause, is the same as section 12, chapter 109, of the Code of 1849. The pertinent provision of this section says, that "upon decreeing the dissolution of a marriage, and also upon decreeing a divorce, whether from the bond of matrimony or from bed and board, the court may make such further decree as it shall deem expedient, concerning the

estate and maintenance of the parties, or either of them, and the care, custody and maintenance of the minor children."

But the power of courts of equity to decree alimony did not originate in any statute. It is a power inherent in them. *Stewart* v. *Stewart,* 27 W. Va. 167, 172-3, and cases cited; *Carr* v. *Carr,* 22 Grat. (Anno.) 168, and notes. It had its origin in the legal obligation of the husband, incident to the marriage state, to maintain his wife in a manner suited to his means and social position. *Harris* v. *Harris,* 31 Grat. 17. And the general rule is, without doubt, that the income of the husband, whether derived or to be derived from his personal exertions, or from permanent property, or from both, is the fund from which alimony is derived, and the amount will depend on the circumstances of each case. *Cralle* v. *Cralle,* 84 Va. 202. Citing *Harris* v. *Harris,* and *Carr* v. *Carr, supra,* and *Myers* v. *Myers,* 83 Va. 806. The power given by our statute, above quoted, existed independently of the statute. The statute is little more than an affirmance of an old rule or principle of equity cognizance. The words "concerning the estate" of the parties, are evidently meant to give the court authority to protect each party in the possession and enjoyment of his or her respective estate, subject to such alimony as may be decreed, and not to authorize the transfer of the legal title to the land by way of alimony. It was said by Judge Brannon, in *Goff* v. *Goff, supra,* that this statute is very broad, sufficient, as in that case, to justify the making of a money decree for alimony, a lien on the husband's land, and to enforce the same by a sale of the property. Farther than this we are not disposed by judicial interpretation to extend the statute.

In view of the history of the legislation in Virginia, and in this state on this subject, and the judicial decisions referred to, we are disposed to arraign ourselves on the side of the greater weight of authority, in denying the power of the Court, independently of statute, or of some special circumstances, not present in this case, to transfer to the wife, as permanent alimony, the fee simple title of the husband in his lands. Especially should this rule prevail in decreeing a divorce from bed and board. The parties may become reconciled and be restored to all their martial rights and relations, and it would be bad practice to lay down a different rule.

Our conclusion, therefore, is to reverse the decree below, in so far as it decrees the transfer of defendant's real estate to his wife, and to remand the cause to the circuit court with directions, to make a reasonable money decree by way of alimony, making the same a lien on defendant's land; and to set aside the deed from Coleman, special commissioner, to Mrs. Reynolds, and to cancel, set aside and annul the deed from her to Coleman for an interest in said property. We are also of opinion to reverse the decree giving costs against defendant and his surety on his bond. The decree here will be accordingly.

*Affirmed in part. Reversed in part. Remanded.*