# CHARLESTON.

Sadie V. White *v.* W. A. White

(No. 6229)

Submitted February 5, 1929. Decided February 12, 1929.

*Hartley Sanders,* for appellant.
*Hugh G. Woods* and *John M. McGrath,* for appellee.

WOODS, PRESIDENT:

Plaintiff complains of a decree of the circuit court of Mercer county denying her a divorce from bed and board, and dismissing her bill.

The bill alleges numerous instances of cruel and inhuman treatment and physical violence and reasonable apprehension of bodily hurt therefrom, as well as injury to plaintiff's health, and prays for a divorce from bed and board, the custody of three infant children, and suit money and alimony. The answer specifically denies the charges set up in the bill.

The testimony of the plaintiff in part is to the following effect: Soon after their marriage the defendant began to accuse her unjustly of adultery and constantly kept her in fear of bodily harm. After the birth of the first child (eleven months after marriage) defendant falsely accused her of having committed adultery with the physician who attended her in confinement, and that he so abused her that she could not sleep and caused her to suffer so that her friends sent for her father for her protection. She was accused of meeting with other men for immoral purposes. One night her life was threatened with a razor; the following morning defendant

threatened to sell the furniture and brought a furniture dealer to the home and listed the same. Plaintiff went to the home of her father, and after a few days was entreated to return, and did return to her husband. While pregnant with the second child (four years after marriage), she was again compelled to leave on account of the husband's cruelty, his constant rowing and fussing, and his repeated accusations of adultery; that his actions rendered her so nervous that she could not endure it any longer; that her nerves would not hold out. In order to persuade her to return, defendant entered into a bond for $1,000.00 conditioned on his good behavior. After plaintiff's return conditions got ''a good deal worse'' than they had been before. On one occasion defendant struck her on the shoulder with his fist so hard that she carried a blue spot for almost a month, and, at another time, he cursed and struck her and threatened to ''finish her'' with a butcher knife, and carried on so that she called the officers and had him arrested. One evening he accused her again of having some man in the house for immoral purposes, and threatened to slap her over, and later drew a chair on her; she called to one of the roomers for help. A third time she was compelled to leave on account of the defendant's conduct toward her. The defendant again entreated her to return, and, on his own initiative, entered into a bond for his good behavior, the bond being in the penalty of $3,000.00, and payable to plaintiff ''if, within fifteen years from the date of this agreement, the said Sadie White should be compelled, by reason of the *bad and improper treatment and conduct* of said W. A. White towards her, to leave his home and to cease to live with him as his wife''; and, after much persuasion she returned to the defendant. Defendant again began to accuse her of illicit relations with other men, and would examine the house on return from work to see if any one had been there. He called plaintiff many vile names in the presence of the children, and on several occasions struck her. He drew a poker on her, and, at another time, threw hot water at her. A few days before the final separation defendant again began ''quarreling and fussing and raging around'' because plaintiff would not agree with him to sell their home, in which she

had a half interest. On the night immediately preceding the separation, he drove plaintiff from their bed room, and the following morning ordered her "not to use any coal or kindling and not to get anything more at the store, and went on out doors." Plaintiff, thinking he had gone to work, locked the screen door. Defendant returned in a few moments and kicked the screen out and tore it up, and warned plaintiff that, if she called anybody or got in communication with anyone, he would come in on them and kill them and her too. He then "churned the plaintiff down" on her shoulder right hard with his fist; and told her if she did not surrender up what she had that day that that would be her last day. Immediately on his departure plaintiff, in fear of bodily harm or death at plaintiff's hands, called a lawyer and a neighbor, at 6:30 A. M., for advice. She left the home and went to a neighbor's about noon, and her father, who had been notified, met her there that night. Since that time plaintiff has not cohabited with defendant. The husband, however, denies all such acts of misconduct on his part, as enumerated by the wife, except he does admit that he and his wife had some little family differences.

While most of the testimony of the relatives, neighbors and others, introduced on behalf of both parties, owing to the nature of the case, has no evidential value in proving or disproving whether or not the wife was subjected to cruel and inhuman treatment causing reasonable apprehension of serious bodily hurt, we find much in the record to corroborate the testimony of the wife and to discredit that of the husband.

The fact that the plaintiff returned to her husband on three separate occasions does not destroy her present right to rely on acts similar in nature to those committed prior to the former reunions. Condonation by the wife of specific acts of cruel and inhuman treatment by her husband are treated as conditioned on his subsequent good behavior, and will never be allowed to weaken her title to relief, and if such acts be subsequently repeated the condoned acts will be revived as ground of divorce. *Deusenberry* v. *Deusenberry*, 82 W. Va. 135.

One of the main charges, already adverted to, relied on by the wife to justify her separation from her husband, was cruelty he had inflicted upon her by charging in the presence of others that she was untrue to her marital vows, and was guilty of illicit intercourse with other persons. One of such charges was made, according to her testimony, while she was still suffering the effects of travail. Mrs. Wright, a first cousin of defendant, bears out this accusation. She went into the home the day following the birth of the first child and remained for eleven days. This party testifies that in the evening following her arrival, the defendant came home "wild and rowing and charging and wanted to know who had been there", and upon being informed by her that nobody had been there during the day except herself and Sadie (plaintiff), said "he knew damn well somebody had been there and knew that damn doctor had been there, and proposed to throw the furniture out of the house." This conduct on his part was at the bedside of his wife. As a result, according to Mrs. Wright, the plaintiff "got very nervous, and almost in a dying condition." It is difficult to conceive of greater cruelty that could be inflicted upon the mind of a virtuous woman than to be made the subject of such a charge at any time, especially under such a situation. The mental anguish thus occasioned would doubtless be more keenly felt, and would produce more mental pain than could result from personal injuries or physical blows.

On another occasion the defendant, according to plaintiff's testimony, threatened to get the butcher knife and "finish her", and started for the kitchen cabinet for the knife, thereby causing her to leave the house and remain out in the snow. He was taken to jail by the officers on the wife's request, and on the following morning was tried before the police judge and fined for "disorderly conduct in his home, fighting and making threats". While the evidence on this point is not very clear as to just what the husband was actually fined for, yet the fact that he was arrested and tried is a strong circumstance in support of the wife's contention that he had put her in fear of bodily harm, and likewise discredits his denial of all acts of cruel and inhuman treatment.

Mr. Campbell, the furniture dealer, testifies that on one occasion he was called into the home to make a list of the furniture which the defendant wanted to sell him, and stated that when the sewing machine was pointed out the plaintiff started to cry, and that he decided not to buy the furniture. However, upon the insistence of defendant, he did give him a check so that he could show it to his wife, and, as he states, "effect a compromise and get along".

Several parties who had previously roomed at the White home testify that on various occasions they heard a great deal of cursing on the part of Mr. White, and also heard Mrs. White crying. Evans states that on one night defendant "raised a racket" and accused the plaintiff of having some man there during the day for immoral purposes, threatened to slap her over, and that she called him (Evans) three times; that he ventured out into the hall and found defendant standing at the open door with a chair in his hand; that defendant asked him not to come in or interfere with anything that was going on, saying "he would hit me with the chair"; that Nannie White, a sister of the defendant, was in the room with the parties, and was crying; that she left that night, taking her suit case with her. Mr. White. while admitting that he had a chair in his hand, states that he never drew it on his wife.

The father of the plaintiff also testified to many acts of cruelty. He also testified as to the condition of the broken screen door. While the defendant seeks to disparage his testimony on the ground of relationship, claiming that his frequent visits to the home of his daughter was the primary cause of much discord, yet the actions of the father all through seem to be very commendable, and show that he was interested in the happiness of the couple. He paid $3,000.00 on the house which belongs to the plaintiff and defendant jointly, and also liberally supplied them with produce from his farm which was some miles out of Princeton. At the last separation of the spouses, on receiving a summons from the daughter, he, with a fortitude worthy of a Spartan, trudged through the snow a distance of fourteen miles to answer her call—truly a "call of the blood".

What is the effect of the bonds given by the defendant? The first, in the penalty of $1,000.00, was destroyed; but the second, a $3,000.00 bond, hereinbefore referred to, is in the record. In the case of *Rice* v. *Rice*, 88 W. Va. 54, a bond not to again break the peace toward the plaintiff was held to be an admission of such conduct. Defendant in the instant case contends that the $3,000.00 bond does not amount to a clear admission upon his part that he had been guilty prior thereto of "bad and improper treatment" of his wife, but that it only applied to possible acts in the future. A man ordinarily is not called upon, nor does he enter into a bond to refrain from "bad and improper treatment" or any other abuse, unless he first has been guilty of such treatment or abuse. The fact that the wife had left her husband three times on the ground of alleged cruel and inhuman treatment supports her contention that it was given in view of past acts in order to cause her to return to the home. The fact that the present bond was written at the instance of the husband, and by his attorney, makes the admission doubly strong, since the husband undoubtedly looked after and had his own interests properly protected by the language used.

While the several circumstances heretofore specifically referred to relate in the main to instances prior to the third reunion, yet they all tend to support the wife in her version of the innumerable acts of the husband making unbearable life for her in the home. These physical situations sometimes speak more weightily than the vocal utterances of any witness, or number of witnesses. The former cannot falsify. The latter can, and often do. The one is indisputable—the other never is.

"Cruel and inhuman treatment", relied on here, one of the statutory causes for divorce in this State, is, like negligence, a relative term, and of necessity must depend upon the circumstances of each particular case. In *Goff* v. *Goff*, 60 W. Va. 9, in which there were insults, vile names and threats of personal violence by the husband towards the wife, over a period of times and repeatedly, the court held that "neither actual violence, nor immediate danger of it, is absolutely essential" to establish cruelty, to justify divorce. "If the

husband's treatment be coarse, unnatural, abusive, so as to render life a misery, prey on the wife's mind; produce mental anguish, impair her nerves, and endanger her health, it is enough." The court there held: "Such conduct and acts by a husband toward his wife, such treatment of her by him, as produces reasonable apprehension in her of personal violence, or produces mental anguish, distress and sorrow, and renders cohabitation miserable, impairing, or likely to impair, the wife's health or mind, is cruel and inhuman treatment authorizing a divorce from bed and board, under Chapter 64, section 6, though there be no personal violence."

Our conclusion is that the plaintiff has shown herself entitled to a divorce *a mensa et thoro* by a clear preponderance of the evidence, so we reverse the decree of the circuit court to that extent. Since the questions of alimony and the custody of the child are ordinarily matters for the exercise of the sound discretion of the trial court, subject to review by the appellate court, upon the granting of a decree of divorce, we remand the cause that the chancellor may enter a decree disposing of alimony and custody as will do justice between the parties, and otherwise in accordance with the tenor of this opinion.

*Reversed and remanded.*