# WHEELING

## STOVER v. STOVER.

### Submitted March 6, 1906.　　Decided June 13, 1906.

1. ADVERSE POSSESSION—*Color of Title.*

    A contract of partition in writing under seal partitioning land
    between the parties thereto describing and defining the boundaries
    of the land to be held by each in severalty, mutually binding them-
    selves to each other in a specified sum that if any of them should
    lose any of the land so held and improved by him that the others
    should make it good, and each of the parties enters into possession
    of the portion so set apart to him and continues in open, notorious
    and adverse possession thereof, such contract with such possession
    is "color of title." (p. 293.)

2. ESTOPPEL—*Laches—Acquiescence in Partition.*

    One of the parties to such contract who acquiesces therein recog-
    nizing the rights of all the parties thereto for a period of over
    thirty years, is, by his gross laches, estopped from claiming title to
    the portion set apart to either of the other parties to the partition.
    (p. 294.)

3. OPINION OF CIRCUIT JUDGE—*Not Reversible Error to Make Part of Record.*

It is commendable in the judge of a circuit court to file in a cause his written opinion therein, and it is not reversible error to make the same a part of the record in the case. (p. 294.)

4. SAME—*Appellant not Bound to Include in Recoed.*

In such case, however, the appellant or plaintiff in error is not bound to include such opinion in the record with his application for appeal or writ of error. (p. 294.)

Appeal from Circuit Court, Raleigh County.

Bill by Lewis Stover against Stephen Stover and others. Decree for defendants, and complainant appeals.

*Reversed.*

A. P. FARLEY, J. H. McGINNIS, J. D. McGINNIS, and WATTS, GAINES, DAVIS & MATHEWS, for appellant.

McCREERY & BALL, for appellees.

McWHORTER, PRESIDENT:

John Stover made his will dated November 3, 1851, and which was admitted to probate on the 24th of the same month in the county court of Raleigh county, in which will he disposed of his "home place" in the following item: "3rd. My home place on which I live I will to my beloved wife during her life time and at her death it is to belong to Silas, Lewis, Stephen, Daniel, (my sons), equally. And my afflicted daughter Manervy, is to be taken care of by her mother and my four sons to whom I will the home place, or if deemed best Manervy may be removed to the Lunatic Asylum at Staunton, Va." This is the only part of said will involved in this suit.

On the 1st day of April, 1867, Silas Stover, Stephen Stover and Lewis Stover entered into a contract in writing under seal agreeing to make partition of the said "home place" among themselves, in which they partitioned the said "home place" describing the boundaries of the land which the said Silas should have and also which the said Lewis should take, and providing that "all the remainder of said land is Stephen's." On the 3rd day of August, 1867, Daniel Stover and his wife by deed of that date sold to Stephen Stover all the interest of said Daniel in said tract of land.

At the January rules 1903, Lewis Stover filed his bill in chancery in the circuit court of Raleigh county against the

said Stephen Stover, Silas Stover and Daniel Stover exhibiting the will of said John Stover and the contract of partition as well as a copy of a deed from Daniel Stover to Stephen for his part or interest in said "home place;" alleging that in pursuance of said partition each one then took possession of the part so allotted to him; that by reason of said partition plaintiff accepted his portion of land so allotted to him, entered it upon the land books of Raleigh county in his name and had regularly paid the taxes thereon ever since; that he had made valuable improvements thereon, building houses and fences thereon, clearing and cultivating the same; that ever since the partition in 1867 plaintiff had been in actual, exclusive, open, notorious and adverse possession of the said land so allotted to him in said partition and was yet in the actual exclusive possession of the same, claiming the same under said partition; that the widow of John Stover, the testator, died in the year 1866; that plaintiff made no claim to any other portion of said home tract except that which was allotted to him in said partition, nor had he made any claim to any portion of the land allotted to Silas or Stephen since said partition was made; that plaintiff was entitled to a deed for that portion of the land so allotted to him and that he was ready and willing to make a deed to Silas and Stephen for the portions allotted to them respectively, but that the said Silas and Stephen although often requested had refused and still refused to make such deed; and praying that said Silas, Stephen and Daniel Stover be made parties defendant to his suit and that upon their continual refusal to convey the plaintiff the land so allotted to him that a commissioner be appointed to make such conveyance, and for general relief.

The defendant Stephen Stover appeared and filed his demurrer and answer to the plaintiff's bill; depositions were taken on behalf of plaintiff, and the deposition of Stephen Stover in his own behalf, there being no appearance for the other defendants who were duly summoned, prior to the filing of the bill. The answer of Stephen Stover contains this allegation: "Your respondent further says that Lewis Stover on the 18th day of October, 1856, conveyed by deed to your respondent and Daniel Stover his entire interest in the land of John Stover, deceased, to take care of his sister, Minerva

Stover, his afflicted sister, as will appear from a copy of said deed herewith filed marked, 'A,' as a part of his bill.'' And also alleging the fact of the conveyance by Daniel Stover to respondent on the 3rd day of August, 1867, of all his interest in his father's land which included the interest conveyed to them by Lewis Stover in the home tract; that by virtue of said deeds the title of the said Lewis Stover and Daniel Stover vested in respondent. There was a general replication to the answer of defendant and on the 28th of July, 1904, the cause was heard upon the bill of plaintiff, the answer of Stephen Stover with the replication thereto, and exhibits filed with the bill and answer and the depositions of witnesses, when the court held that the plaintiff was not entitled to the relief prayed for and dismissed plaintiff's bill and gave judgment for the costs of Stephen Stover. From which decree the plaintiff appealed. It does not appear that the demurrer was passed upon by the court. This in effect overruled the demurrer. *Fluharty* v. *Mills*, 49 W. Va. 446; *Craig* v. *Craig*, 54 *Id.* 183. The demurrer is a general demurrer, and if the bill as a whole states facts entitling the plaintiff to relief the demurrer should be overruled. *LeSage* v. *LeSage*, 52 W. Va. 323; *Hinchman* v. *Ballard*, 7 *Id.* 152; *Miller* v. *Hare*, 43 *Id.* 647. It was proven by the clerk of the county court of Raleigh county that the contract of partition was on file in the clerk's office of the county court of Raleigh county. It is proved by Lewis Stover and corroborated by Silas Stover and D. L. Maynor who wrote the contract of partition that the several parties entered into possession under the said partition agreement when the partition was made; and Stephen Stover in his testimony says that he and Silas and Lewis agreed on the division before the lines were run by Captain Turner and that by reason of such agreement he had Captain Turner run it off and that the several parties took possession of their respective parcels when the same was so partitioned, defendant claimed that Lewis was put in possession by his mother but admitted that he had been in possession of the land ever since the partition. James M. Wright, the son-in-law of Lewis Stover, who was in possession of the parcel laid off to Lewis Stover in the partition says: "Something like three years ago Stephen was in the road and I was on the place fixing the fence, and Stephen asked me if Lewis

had given me and Susan that place, and if he had not he intended to talk to Lewis and get him to do it, that he did not want me to lose the work I had done on the place, he told me that several times, or a number of times." Silas Stover, his brother, testified that they all agreed to the partition and said that they severally remained in possession of their parts and he never knew of Stephen claiming the land held by Lewis until about two years before his deposition was taken in this case when Stephen brought an action against Lewis for the land, and stated that he and Stephen were going down the road one day when Stephen said the line ought to have run down by the river so that his cattle could get water that the river ought to be the line between him and Lewis. This conversation took place about three or four years before he was testifying. Lewis Stover testified that the deed was made by him to Stephen and Daniel at the suggestion of Stephen and Daniel and his other brothers to keep his wife from suing him for maintenance; that he and his wife had parted and she was talking about suing him for maintenance and he deeded it to the boys and they were to deed it back to him; that he and his wife only remained separated not more than a month or a month and a half and lived together some forty years after they became reconciled. Evidently it was the intention of all the parties that a deed made by Lewis to Stephen and Daniel should not take from Lewis his interest in the home farm. The purpose of making the deed as stated by Lewis is not denied or disputed by Stephen nor anyone else. This was a family matter among the four sons of the testator and it was the purpose that each should have a fair share of the "home place." Stephen remained at home with his mother who took care of the afflicted daughter and sister, and Lewis testified that for the part taken by Stephen in caring for the sister the better part of the farm, as he expressed it, "the heart of the farm," was given to Stephen. In his answer Stephen refers to the consideration of the deed executed October 18, 1856, by Lewis to Daniel and Stephen as "to take care of his sister Minerva Stover his afflicted sister as will appear from a copy of said deed herewith filed marked 'A' as a part of his bill" (meaning his answer). There is no copy of the deed mentioned in the answer as "Exhibit A" filed with and as a part of the record. At the

end of the record, after the certificate of the clerk, under the heading "Appendix" and following the record, is a paper purporting to be a copy of a deed bearing date on the 18th day of October, 1856, from Lewis Stover to Stephen Stover and Daniel Stover, the consideration of which, mentioned in the deed, "is the sum of $300 to him in hand paid to the said Lewis Stover," and makes no mention of caring for his afflicted sister. The consideration set out in the deed filed as an appendix to the record does not agree with the consideration stated in the answer of the defendant as being contained in the paper purporting to have been filed with his answer, in other respects, as, the date of the deed, and the parties thereto, the description of the paper corresponds to the description given of it in the answer. Whether this paper was technically and sufficiently made a part of the record by the reference to it in the answer, not being copied in to the record, is of little moment, as it is admitted by plaintiff on the witness stand that he executed such a deed explaining how he was induced to make the deed and for what purpose it was so made as above stated and not a cent of the consideration mentioned therein paid. It is very clear from the evidence not only of the plaintiff but of the other witnesses that Stephen never made any claim to the land under that deed until shortly before the institution of this suit, but had stood by for more than thirty years living near to the land with the complete knowledge that the plaintiff was claiming the land and holding possession of it all that time under the contract of partition utterly ignoring any right that he might have had or claimed under such deed. This deed was made in 1856 for the plaintiff's interest in said land to his brothers Stephen and Daniel as he states for the purpose of guarding against his wife's threatened prosecution for maintenance and that the boys were to deed it back to him. He states in his deposition on cross-examination that he had forgotten all about making said deed and the parties eleven years afterwards entering into this partition agreement and taking possession of the several parcels laid off to them by metes and bounds and the fact that no one denies or disputes the statement of plaintiff as to the purpose of his making said deed, is strongly corroborative of the theory of plaintiff, and the defendant never making any claim under said deed after it

was made, at any time, is strong proof that he always under-
stood the matter in the same way that the plaintiff did, and
that he was holding the land, if at all, for the benefit and use
of the plaintiff, if indeed he had not, like the plaintiff for-
gotten all about the making of the deed.    The agreement of
partition showed by metes and bounds the particular portion
of the "home place" to be held in severalty by each of the
three brothers; one portion each to Silas and Lewis and two
portions to Stephen, being his own and that of Daniel. While
the portion of Daniel was conveyed to Stephen after the date
of the partition agreement he had purchased from Daniel at
the time of the making of the said agreement.   Maynor, the
witness who wrote the agreement, says:     "I wrote it at the
instance of those parties—Silas Stover, Stephen Stover and
Lewis Stover—Daniel and Stephen had a swap in the land,
about this time, and they asked me to assist in having a
division of the land, so Daniel's and Stephen's part could be
laid off to itself, and I did it."

This partition agreement does not in terms convey title to
Lewis, but being under seal imports a valuable consideration.
1 Beach on Mod. Cont. section 5; *Assurance Co.* v. *Hotchkiss*,
90 Wis. 415; 63 N. W. R. 1020; *Storm* v. *United States*, 94 U.
S. 76. And further as to the matter of consideration, defend-
ant Stephen Stover in his answer, referring to the contract of
partition, says:   "No doubt if said contract was executed as
claimed, it must have been with the understanding and agree-
ment that the said Lewis Stover would assist in the care,
maintenance and support of said Minerva Stover as required of
him by the Will aforesaid."  Here is an admission in his answer
on the part of the defendant, that there was a valuable con-
sideration passing from Lewis if the contract was actually
executed, and as to the fact of its execution there is not the
slightest room for doubt.   It would seem to be claimed that
because Lewis had once conveyed his interest he never could
be again invested with any rights in the land in any manner.
By the said contract the parties bound themselves, their heirs
and administrators in the sum of five hundred dollars for the
true performance of the division or partition agreed upon,
and that if any of the parties should lose any of the said
land held and improved by either of them the others were to
make it good.   Here was a distinct responsibility assumed,

the promises were mutual and binding on all alike. It is stated in the contract that the land to be partitioned was the land left them by John Stover, and by clear implication admits that Lewis Stover was entitled to participate in the partition of the land, whether by repurchase or otherwise, or probably Lewis and Stephen regarding· the fraudulent deed made by Lewis to Stephen as vesting no right or title in the latter, and Stephen being willing that Lewis should have the share of the property under the will of their father waived and ignored the technical right the deed had given him.· In *Railroad Co.* v. *Bank*, 102 U. S. 14, at page 46, Mr. Justice Clifford, speaking for the court, says: "A valuable consideration in the sense of the law,   *   *   *   may consist either in· some right, interest, profit, or benefit accruing· to the property, or some extension of time of payment, detriment, loss or responsibility given, suffered or undertaken by the other." See also *Train* v. *Gold*, 5 Pick. 380; *Currie* v. *Misa*, 10 L. Rep. of Ex. 153-162.

Does not the contract of partition under which plaintiff held possession of the portion of the property set apart to him amount to color of title? In *Core* v. *Faupel*, 24 W.Va. 238, JUDGE SNYDER, in speaking for the Court, at page 247 says: "The principal office of a claim or color of title is to define the boundaries and describe the extent of the adverse holding. If it is a mere claim—that is, a mere assertion of right without any paper title—the adverse holding will be limited to the actual enclosure of the claimant. *Kincheloe* v. *Tracewells*, 11 Grat. 587. But, if it is founded on a deed or other documentary title, the holding will be treated as co-extensive with the boundaries contained in such deed, or document, provided the possession of the adverse claimant is exclusive. In *Creekmur* v. *Creekmur*, 75 Va. 430, Judge Staples, at page 438, says: "Without attempting now to describe color of title it may be perhaps sufficient to say its effect is to fix the chnracter of the occupant's possession and to define its extent and limits." In that case the Sixth Point in the Syllabus is a *quaere:* "What is color of title?" *Oney* v. *Clendenin*. 28 W. Va. 34-54; *Adams* v. *Alkire*, ⸢20 W. Va. 480-485. Possession under a void deed is sufficient to give color of title. *Randolph* v. *Casey*, 43 W. Va. 289; *Swan* v. *Thayer*, 36 *Id.* 46; 1 Cyc. 1047; Code, chapter 90,

section 19.  Section 1981, 3 Washburn on Real Property, comes as near covering the whole ground as to what is "color of title" as any authority we find. In *Veal* v. *Robinson,* 70 Ga. 809, it is said: "Color of title is anything in writing purporting to convey title to the land which defines the extent of the claim, it being immaterial how defective or imperfect the writing may be, so that it is a sign, semblance or color of title; and if they (the jury) should be satisfied from the evidence that the defendant was in actual, public, continuous, peaceable, notorious and uninterrupted possession of the premises for seven years prior to the commencement of the suit under such color of title, and that her claim did not originate in fraud, and that she held in her own right, in good faith, against all other persons, including her husband; then she was entitled to . retain possession of the land." ˙ In *Shanks* v. *Lancaster,* 5 Grat. 110, it is held: "It is immaterial whether an adversary possession under a claim of title be under a good or bad, a legal or equitable title." In *Allen* v. *Johnson,* 2 McMullan (S. C.) 495, (Syllabus pt. 3), it is held: "When a party indicates the boundaries of his land by stakes, for more than ten years, by which he shows the extent of his possession, and the boundary thus indicated is made known to the adverse party, who is interested to deny it, and they acquiesce therein, it is good title to the land by possession, with a color of title." The contract of partition describes the boundaries of the land held by plaintiff and under which he held the land in undisturbed possession open, notorious, exclusive, continuous and adverse about thirty-five years before any claim was made by the defendant Stephen Stover and all that time Stephen not only acquiesced in the partition that was made, but recognized, according to the proof in the case clearly made, his brother Lewis as the true and legal owner of the land in controversy.  This partition contract, while not in form a conveyance, is an acknowledgment or concession that the plaintiff was entitled to a share in the property whether under the will of his father John Stover or otherwise and by it they agreed to hold in severalty the land set apart to them thereby and therein well described and defined.  Each went into possession and had held his share or portion so allotted to him ever since and this was so held by the plaintiff with the knowledge and consent of

all the other parceners.    This being the case and the condition of the affairs in the matter for some thirty-five years or more, the contention of counsel for plaintiff that the defendant Stephen Stover is chargeable with gross *laches* is well taken.    If he had the claim that he now insists upon he should have exercised his right long years ago.

It is claimed by appellant that the court erred in making his written opinion a part of the record in the case, "which is special error apparent on the face of the record." There is certainly no impropriety in the judge of a circuit court filing a written opinion in a case, but on the other hand it is commendable in him to do so, and if the appellee or defendant in error desires to do so he can bring it up at his own expense; the appellant or plaintiff in error is not bound to bring such opinion up as part of the record.

For the reason herein set forth, the court erred in dismissing plaintiff's bill, hence the decree complained of is reversed and annulled and the Court proceeding to render such decree as the circuit court should have rendered, it is adjudged, ordered and decreed that the defendants are required to make, execute and deliver to plaintiff an apt and proper deed with special warranty to the plaintiff for the portion of land set off and allotted to him by the contract of partition and that this be certified to the circuit court of Raleigh county and on the failure or refusal of the defendants to execute said deed that the circuit court appoint a commissioner to execute and deliver the same in the name and on behalf of the said defendants.

*Reversed.*

Brannon, Judge, · (*concurring:*)

Say that the deed from Lewis Stover to Steven Stover is in the case.    From this it is urged that the deed took away Lewis Stover's interest, and it could not be re-vested in him but by deed.    We cannot say it was not intended to operate, or ignore it; but we can say that the subsequent agreement recognized a joint ownership.    Being under seal it estops Steven Stover from denying Lewis a share.    Though the deed did pass title from Lewis, we may say he bought it back, or acquired right by purchase, release or in some way. The agreement warrants us to say so.    The parties were

joint owners, and that agreement divided the land, and thereafter the parties held their several parts in severalty. The rule is, that possession by one tenant in common is not adverse to the others; but in this case that agreement ended the joint ownership, and thereafter each held not as co-tenant, but in severalty, and if one should claim against the other, that other could rely on limitation. This would give Lewis Stover title over his brother. He would have good title under the statute. *McNeely* v. *Oil Co.*, 52 W.Va. 616, point 8. But does a title by limitation enable one to go into equity to call for a deed from his adversary? I should say not as a rule; but here the parties consented to separate ownership and possession, and covenanted to convey. They agreed to convey, and I think equity would enforce this covenant in order to make a showing of title by record. And I suppose there is jurisdiction in equity to remove a cloud, and in view of that covenant to enforce a deed. The statute passes hostile title to the adverse possessor-transfers title; but that gives no right to call on equity to compel a conveyance; but here is an agreement to convey. I think the agreement can be enforced in equity.

Note by POFFENBARGER and COX, JUDGES:

We concur in JUDGE BRANNON's view of the case, and are unable to agree in all the reasoning set forth in PRESIDENT McWHORTER's opinion.