MARDELL COTTLE

*v.*

JUSTIN COTTLE

(No. 9844)

Submitted September 10, 1946. Decided December 3, 1946.

*Ambler, McCluer & Davis,* for appellant.

*Eugene T. Hague* and *William Bruce Hoff,* for appellee.

RILEY, JUDGE:

Mardell Cottle filed her bill of complaint in the Circuit Court of Wood County against her husband, Justin Cottle, charging cruel and inhuman treatment, and praying for a divorce, the custody of the infant child born of the marriage between plaintiff and defendant and for alimony and a fund sufficient for the support and education of the child. In his cross-bill defendant likewise asked for a decree of divorce in his favor, and that he be awarded the custody of the child, Aaron Cottle, age six years, and the possession of certain pieces

of tangible personal property, which plaintiff had taken from the place where the parties last resided. From a decree in defendant's favor, awarding him a divorce and custody of the child, plaintiff appeals.

The case was referred to a commissioner in chancery, who reported that the parties had not proved a case justifying the relief prayed for in their respective pleadings. Upon submission to the circuit court the decree complained of was entered. According to the written opinion of the circuit court, made a part of the record, the court found that plaintiff left the home, deserting defendant, and on that fact alone plaintiff was guilty of cruel and inhuman treatment.

Plaintiff and defendant were married on February 15, 1932, at Covington, Virginia, and lived together until July 22, 1944. During the last five years of their marriage, they resided at Parkersburg.

At the time of the marriage plaintiff, a graduate of St. Joseph's Hospital in Parkersburg, and a registered nurse, had for some time prior to the marriage been practicing her vocation in Parkersburg, and after the marriage continued to engage for about a year in that activity, during which time the fact of the marriage was kept secret, defendant being at that time unemployed.

Defendant having secured a position in the office of the Collector of Internal Revenue in Parkersburg, the parties moved from Roane County to that city, where they lived until the time the differences between them culminated in a separation. From savings which plaintiff had accumulated from her services as a nurse, supplemented with fifteen hundred dollars furnished by defendant's father, they constructed a home on a lot located directly across Juliana Street from the hospital. Five years after their marriage a male child was born to them, by means of a Caesarean operation. Following the birth of this child, plaintiff was compelled to undergo two operations, and after her recovery she again engaged in

her former vocation as a nurse. Until the child was born, the parties evidently lived together amicably.

According to plaintiff's evidence when her health became impaired defendant began to abuse and neglect her and to take an interest in other women, particularly one Martha Wilson, as a result of which she forbade Martha Wilson to make further visits to their home. It is plaintiff's contention, and she so asserts in her testimony, that she was compelled, by reason of personal abuse which she and the child received from defendant, to leave home.

Without corroboration plaintiff testified that after the difficulties between the parties began, defendant on one occasion hit plaintiff and threw her down the basement stairs of their house; that he held her hands and slapped her, knocked her down, and sat on top of her so that she could not defend herself; that the worry and physical strain of this treatment was so great that sometimes it would take her a month to get over "one of these affairs"; that on different occasions it was necessary for her to consult physicians on account of the alleged treatment, and once plaintiff was compelled to stay in bed for four days.

In December, 1943, plaintiff, defendant, plaintiff's mother and her two sisters, Rosalene Depue Walker and Imogene Depue Board, all of whom, except the latter, testified, were present at the home of plaintiff's mother in Parkersburg. According to plaintiff, defendant kept going into the room where Imogene was about to retire for the night, and plaintiff told defendant to stay out. Thereupon, defendant told plaintiff's mother that his wife would not have sexual intercourse with him, and called her degrading names, such as bitch, whore and bastard, and tried to hit plaintiff with a vase, but he was disarmed by Rosalene Walker, and at plaintiff's request defendant called a taxi-cab, which took the Cottles home. When they entered their home and started to remove their coats, plaintiff testified that

she asked defendant why he had said "all those things" in the presence of her mother and sisters, and when she told defendant that she had not heard of the names which she said defendant called her, he struck her on the side of the head causing her to fall on a davenport, where he held both of plaintiff's hands and slapped her on one side of the head and then the other, whereupon the boy Aaron intervened, saying, "You old fool. You stop hurting my Mamma"; and that then, according to plaintiff, defendant hit the child on the side of the head and knocked him across the room. Finally, plaintiff after several efforts, succeeded in calling the police. She said that as a result of the alleged affray she had bruises and scratches on one hand, her arm and throat. She testified that she exhibited her alleged injuries to one of the Sisters at the De Sales Heights Convent, and to her mother, who corroborates her in this. Plaintiff testified that events such as occurred in 1943 in the Cottle home occurred "lots of times".

Plaintiff and defendant, according to plaintiff's uncorroborated testimony, had not had sexual intercourse with each other since the late spring or early summer of 1942, for the reason that defendant did not have any respect for her feelings and "couldn't keep his hands off any other girls"; that on one occasion in Roane County at the farm of plaintiff's father, when one of plaintiff's sisters was present, defendant "kept trying to pick around at her [plaintiff's sister] and getting his hands on her and rubbing his knees against hers and embarrassing her to death", but this sister, whose identity is not disclosed by the record did not testify as to this happening. According to plaintiff, from the time the parties began to live together until the spring of 1943, they occupied the same room and bed, but from that date until the separation they slept in separate rooms.

In the main, except for the happenings in plaintiff's mother's home in December, 1943, defendant denied that he was abusive of plaintiff. He testified that al-

though a number of attempts had been made, he had not had any sexual relations with his wife since April 16, 1938; and that the suspension of such relationship came about at plaintiff's instance. Defendant testified that plaintiff on one occasion told him that sexual intercourse was designed principally for the purpose of giving birth to children, and that she did not wish to have any more children by defendant.

On July 22, 1944, while defendant was at work in his office, plaintiff caused a moving van to come to their home, and haul away a portion of the furniture and personal effects to an apartment at 939 ½ Market Street, in Parkersburg, where plaintiff established a place of abode for herself and the child.

The gravamen of defendant's position is based upon the alleged unnatural sexual propensities of plaintiff. The commissioner in chancery found that it was proved by a preponderance of the evidence that plaintiff "has had a tendency and desire to be intimate with other women; that her attraction for other women was by reason of sexual impulses and that her husband was repulsive to her because he was a man"; but that such proof related to a time more than one year prior to the institution of this suit. In this regard defendant testified that the marriage was not announced until some time in December, 1932, because plaintiff was afraid it would make her friend Pauline angry. (Pauline's last name will not be used in this opinion out of deference to the fact that she is now dead.) In defendant's brief reference is made to a letter purportedly written by plaintiff to defendant describing Pauline's reaction to the announcement of the marriage. This letter, though referred to in the record, was not introduced in evidence, and, of course, cannot be considered on this appeal; but plaintiff testified that the delay in the announcement of the marriage was not because she desired to withhold the fact from Pauline, but because she wanted to wait until defendant was capable of making a living.

On the question of plaintiff's alleged sexual propensity for other women, defendant adduced the testimony of Martha Wilson, a registered nurse who had attended plaintiff during an illness and had spent some time at her home, who testified that plaintiff had told her that she had a very good girl friend, with whom she enjoyed holding hands in the theater, from which plaintiff would get "great satisfaction, more than she could if she was with a male"; and that Pauline was the girl referred to. Martha Wilson lived at the Cottle home during plaintiff's convalescence from an attack of pneumonia in the latter part of 1942, and while there, witness testified, that though she did not sleep with plaintiff, she was in bed with her one morning. On that occasion, according to this witness, plaintiff came to witness' room and got in bed with her and "after so long a while she began to make peculiar passes at me which I didn't even understand"; that plaintiff "appeared to be very passionate and I suppose you would call it making love — that is the best way I could explain it"; and that upon witness objecting to these alleged attentions plaintiff seemed to be frightened and asked her not to tell plaintiff's husband and brother. Martha Wilson further testified that later, while she was in professional attendance on plaintiff in St. Joseph's Hospital in Parkersburg, and after plaintiff was recovering from an illness, she wanted to kiss witness and hold her hands, and after a few days witness, on account of plaintiff's alleged conduct, left the case, telling defendant that plaintiff "didn't need me and it was a waste of money"; but later when defendant asked her the reason she told him that it was due "to the passes" plaintiff made toward her and "things that had happened before." In answer to the inquiry, "What do you mean by the word passes", witness testified that while she was giving plaintiff a bath or giving her morning care and evening care, plaintiff would reach for witness and try to get her over to her bed in order to kiss her.

Frances Cottle, plaintiff's sister-in-law, testified that

during the latter part of September, 1940, she slept at the Justin Cottle home with plaintiff and her son Aaron; that on that occasion plaintiff "began to make advances to me, telling me that she loved me and that she would like to kiss me, and she tried to make over me, and she pushed Aaron over and crawled over in the bed next to me — Aaron was in the middle — and she just made advances of that nature to me"; that plaintiff told witness that she was "crazy" about witness and wanted to kiss her; and that plaintiff did not like defendant and that "she had more satisfaction being with a woman than with a man." Plaintiff also begged witness not to tell witness' husband, the defendant or plaintiff's sister.

Defendant testified that his action in the alleged visits to Imogene Depue Board's room on the evening in December, 1943, was that he went through the room on the only available way to and from the bathroom and on his return passage Imogene was sitting on the edge of her bed fully clothed, and they talked briefly about Imogene's husband, who was defendant's warm friend and then in the armed services. When they left the home of plaintiff's mother on the occasion in December, 1943, according to defendant, he unlocked the door, walked in and removed his overcoat, followed immediately by plaintiff and their son; that from behind he heard plaintiff with blasphemy say, "I don't like the way you talked to my mother", and thereupon plaintiff "jumped" on defendant from behind and kicked him, pulled his hair and tried to "punch" his eyes out; that defendant then grabbed plaintiff around her waist, pinning her arms down "politely", laid her down on the davenport and tried to restrain her from further injuring him; that Aaron then tried to hit defendant and told him to get away from his mother, at the same time persisting in kicking and biting defendant; that witness then shoved the boy away, telling him to get back, and that the latter caught his heel on the hatrack and fell on his back on the carpet. When defendant let plaintiff up, according to defendant, she started to call over long

distance, saying, "I am going to call the draft board out at Spencer and have you sent to the army." Defendant says that when he pushed on the board which controls the contact with the telephone operator to cut the connection, she assumed an angry look and hit defendant under the right eye with the end of the telephone receiver, thereby cutting a gash. Defendant says that after he went to and returned from the back part of the house, the door bell rang, and plaintiff admitted two policemen, who remained for a while and "tried to get us to make up", and that they then left. Defendant denied that he ever shoved plaintiff downstairs or struck her, but he admits that he probably gave plaintiff a good "cussing" at her mother's house; that he was under the influence of liquor at the time and so was plaintiff, the five adults present having consumed two pints of "Four Roses" whiskey. Witness says that he was prompted to complain to plaintiff's mother of plaintiff's alleged misconduct in the hope that matters could be worked out so that a home could be maintained for their son.

On another occasion, according to defendant's testimony, while the parties were living in Roane County, they had had a few drinks and an argument arose between them which, when defendant thought plaintiff became abusive, prompted him to go to bed in the back room, and that in an hour or so defendant heard plaintiff cursing and when he walked out of the room he saw his wife standing with a 410 gauge shot gun which he had bought her, and that she was cursing because she could not get the shell in the gun "to kill me with, and of course I took the gun away from her." According to defendant, plaintiff made threats against him two or three times during a period of six years, as a result of which defendant was in constant fear that plaintiff would do him bodily harm, referring specifically to the alleged episode with the telephone.

In July, 1944, plaintiff sued defendant for a divorce in the Circuit Court of Roane County and obtained an injunction, restraining defendant from conversing with

and molesting plaintiff, as well as their son, while the parties still maintained their mutual residence in Parkersburg. Immediately thereafter on July 22, 1944, plaintiff left the home of defendant and, according to defendant, he did not interfere with plaintiff moving out because of the suit in Roane County and the injunction order. The injunction was later dissolved on the ground that the court did not have jurisdiction.

While this record teems with criminations and recriminations throughout its length, plaintiff's testimony as to the alleged happenings while at her mother's home in December, 1943, is corroborated and stands without substantial contradiction. In fact, defendant admits that in the presence of plaintiff's mother he chided plaintiff for her alleged denial of sexual intercourse with him. Defendant, while admitting that he went into Imogene's room, explains that it was necessary for him to go through the room in order to reach the bathroom. It seems clear that in the presence of several witnesses he called plaintiff vile and degrading names, including son-of-a-bitch, whore and bastard. In this State it is well settled that the false accusation of a wife by her husband of prostitution is cruel and inhuman treatment, which will ground divorce. *Dayton* v. *Dayton,* 107 W. Va. 299, 184 S. E. 118; *Boos* v. *Boos,* 93 W. Va. 727, 117 S. E. 616. "Whore" has a common and accepted meaning. Webster's New International Dictionary of the English Language, Second Edition, Unabridged, at page 2922, gives the following definition: "A woman who practices unlawful sexual commerce, esp. one who prostitutes her body for hire; a prostitute; harlot". See also 45 Words and Phrases, Perm. Ed., 133 and 134. So, in our opinion, on the occasion in December, 1943, the defendant was guilty of cruel and inhuman treatment, which under the statute and the *Dayton* and *Boos* cases would ground a divorce.

But it is stated by counsel for defendant that though he may have been guilty of cruel and inhuman treatment on that occasion, the acts of cruelty were condoned un-

der Code, 48-2-14, by reason of the fact that thereafter and until the separation the parties, though not engaging in sexual relations, continued to live together. Defendant, however, neither in his pleadings nor in his proof sought to assert such defense of condonation. Condonation is an affirmative defense and the burden of proof rests upon the offending party, and an allegedly guilty party who relies thereon as a defense must assert such defense by both pleadings and proof; but the court *ex mero motu* shall take cognizance of condonation where it clearly appears from the record. *White* v. *White*, 121 Va. 244, 92 S. E. 811; *Williams* v. *Williams*, 152 Va. 896, 148 S. E. 579; 9 R. C. L. page 346; 17 Am. Jur., Subject Divorce, Sections 323, 364.

In support of the allegations contained in his cross-bill, defendant proved and plaintiff admitted she denied sexual intercourse to defendant. She justifies her refusal on the ground that defendant was wont to become familiar with other women. But in this jurisdiction "Neither the refusal of sexual intercourse, nor the fact that the parties occupied separate houses or apartments, will alone constitute good grounds for desertion." *Reynolds* v. *Reynolds*, 68 W. Va. 15, pt. 6 syl., 69 S. E. 381; *McKinney* v. *McKinney*, 77 W. Va. 58, pt. 2 syl., 87 S. E. 928; *Roush* v. *Roush*, 90 W. Va. 491, 111 S. E. 334. The *Reynolds* case is the initial holding of this Court on the immediate question. In point 1 of the syllabus in *Wills* v. *Wills*, 74 W. Va. 709, 82 S. E. 1092, this Court held: "Uniform and continued discourtesy of one spouse to the other, manifested in various ways, such as denial of social intercourse, coolness of manner, disavowal of love, expression of hatred and refusal of company at church and elsewhere, while both reside together, the husband providing support and the wife performing the ordinary household duties, is not alone ground for divorce." While the *Reynolds* case and other cases hold that refusal of sexual intercourse is not good ground for desertion, in the *Roush* case, point 2 of the syllabus, this Court held that such denial is not "cruel or inhuman

treatment within the meaning of the statute." (Barnes' Code, Chapter 64, Section 6.)

Of course, the unjustifiable denial of sexual relations, accompanied by an unwarranted suspension of substantially all other phases of martial duty, such as the refusal to perform household or other family duties, is ground for divorce. *Croll* v. *Croll*, 106 W. Va. 691, 146 S. E. 880. But this situation is not portrayed by this record. Defendant in his cross-bill is seeking a divorce from plaintiff on the ground of cruel and inhuman treatment and not on the basis of desertion. Moreover, from the time denial of sexual intercourse first occurred until the parties separated, plaintiff lived in the home with her husband and child, helped to support the home by her work as a nurse, performed a substantial part at least of the household duties, and though during that time the parties differed as to the way in which the child should be reared and the manner of his correction, she assisted in the care of the child.

In further support of defendant's cross-bill, the evidence heretofore referred to as to plaintiff's alleged attentions to other women is relied upon in conjunction with the alleged denial of sexual intercourse, as cruel and inhuman treatment. It perhaps may be suggested that, on the theory of the West Virginia cases which hold that denial of sexual intercourse, accompanied by the suspension of other marital duties, will ground divorce, such denial taken together with the alleged unnatural relations with her friend Pauline and her alleged unnatural advances toward her nurse, Martha Wilson, and her sister-in-law, Frances Cottle, will justify a divorce on the basis of cruel and inhuman treatment. In *Huff* v. *Huff*, 73 W. Va. 330, 80 S. E. 846, this Court held in point 2 of the syllabus: "Vulgar, indecent and unnatural conduct on the part of a wife and her solicitation of the husband to engage in such conduct with her, showing viciousness and degeneracy on her part, are not sufficient grounds for divorce, * * *." This case has been criticized, 43 W. Va. Law Quarterly, 304, and the sound-

ness of the decision may be open to question. If the decision is sound and could be relied upon in this case, the denial of sexual intercourse, accompanied by sexual degeneracy, in our opinion, would not justify the relief prayed for in defendant's cross-bill; but we need not in this case appraise the *Huff* case in order to arrive at what this Court believes would be a just decision in the instant case. This record does not show with any cogency that plaintiff ever engaged in unnatural practices with the deceased girl Pauline. Plaintiff's purported letter to defendant heretofore referred to and contained in defendant's brief is not in the record, and the only evidence bearing in the least upon any unnatural relations with Pauline is gleaned from statements purportedly made by plaintiff to Martha Wilson and Frances Cottle. Nor does the testimony of these latter witnesses as to plaintiff's attitude toward them, in the light of plaintiff's denial, furnish that high degree of proof which is necessary to establish the existence of such relationship. The accusation involves conduct of such a revolting nature that it must be proved by convincing and cogent proof. In the rather recent case of *Wolfe* v. *Wolfe*, 120 W. Va. 389, pt. 4 syl., 198 S. E. 209, this Court held: "The charge of adultery in a divorce suit must be proven by clear, positive and satisfactory evidence. To warrant such a finding, 'the circumstances must be such as would lead the guarded discretion of a reasonable and just man to the conclusion * * *'. *Loveden* v. *Loveden*, 2 Hagg. Const. 1, 31; 161 Eng. Full Reprint, 648." In that case the Court held that a charge of adultery must be established by the degree of proof which lies "in the twilight zone required by the 'beyond a reasonable doubt' rule in criminal cases and the 'preponderance of evidence rule' in civil cases." That being the prevailing rule in divorce cases in which adultery is charged, this Court should be prompt to apply the rule where one spouse charges the other with conduct against nature.

The opinion of the trial court was by decree made a part of the record. This is a commendable practice.

*Stover* v. *Stover,* 60 W. Va. 285, 294, 54 S. E. 350. While the opinion itself does not become a finding of the court, nor a part of the judgment rendered, it operates "to point out the specific ground on which the trial court acted." *Woodruff* v. *Gilliam,* 116 W. Va. 101, 109, 179 S. E. 873; *Robertson* v. *Vandergrift,* 119 W. Va. 219, syl., 193 S. E. 62. The opinion of the trial court was to the effect that defendant was entitled to a divorce on the ground that plaintiff's action in calling a moving van to the home and causing a portion of the furniture and personal effects therein to be hauled away to her apartment at 939 ½ Market Street, where she and her child took up their place of abode, was such inequitable conduct as would preclude plaintiff from obtaining a divorce. In the entry of the decree the trial court, as disclosed by its written opinion, evidently relied upon this ground and not upon the evidence bearing on plaintiff's actions in relation to other women.

We, however, are of the opinion that the moving of furniture and personal effects from the home and establishing an abode for herself and child elsewhere, does not entitle defendant to a divorce, because defendant himself was guilty of cruel and inhuman treatment, as heretofore stated, which was not condoned; and in our opinion plaintiff was not justified, without notice to defendant, in removing herself and child from the home and establishing a separate abode elsewhere. Her actions in this regard were such inequitable conduct as would preclude her from a divorce. *Wolfe* v. *Wolfe, supra; Mohr* v. *Mohr,* 119 W. Va. 253, 193 S. E. 121; *Edwards* v. *Edwards,* 106 W. Va. 446, 145 S. E. 813; *Maxwell* v. *Maxwell, supra; Wass* v. *Wass,* 41 W. Va. 126, 23 S. E. 537.

We are of opinion that the decree complained of should be reversed and the case remanded for the trial court's consideration, in the light of this opinion, of the question of the child's custody, and because this question is un-

decided here, the bill of complaint and cross-bill should not be dismissed at this time.

*Reversed and remanded with directions.*

FOX, JUDGE, dissenting:

In my opinion, the decree of the Circuit Court of Wood County entered in this cause should be affirmed. The majority opinion fairly pictures the evidence of what occurred between the parties, and it is not my purpose to deal with the facts, but rather with the application of what I think is the law, as applied to those facts.

The commissioner in chancery, who heard this case, came to the conclusion that neither party was entitled to a divorce. The trial court sustained the defendant's exception to the report of the commissioner, and awarded to the defendant a divorce upon the allegations of cruel and inhuman treatment contained in his answer and cross-bill, and from that decree we granted this appeal.

Plaintiff, in my opinion, established her right to a divorce solely on the occurrence at her mother's home, in Parkersburg, in December, 1943. On that occasion, the defendant, Justin Cottle, was guilty of using language which, under our statute, created ground for divorce. What occurred later in their own home on that same night, as testified to by plaintiff and defendant, need not be considered, because there is no corroboration. If the case rested upon what was proved to have occurred at the home of plaintiff's mother, I would say that plaintiff would be entitled to a divorce; but I do not think the record shows that there was any subsequent act of cruelty on the part of the defendant, such as accusations of infidelity or other types of cruel and inhuman treatment. So far as the record discloses, the parties lived together in peace and harmony, though sexual inetrcourse was not present, from that time until July 1944, when plaintiff left the home of defendant. In my opinion, this amounted to condonation by plaintiff

of defendant's conduct on and prior to December, 1943, under Code, 48-2-14, which provides: " * * * nor shall a divorce be granted for any cause when it appears that the suit has been brought by collusion, or that the offense charged has been condoned, or was committed by the procurement or connivance of plaintiff, * * *". This statute has been applied in numerous cases. *Deusenberry* v. *Deusenberry*, 82 W. Va. 135, 95 S. E. 665; *Rice* v. *Rice*, 88 W. Va. 54, 106 S. E. 237; *Hatfield* v. *Hatfield*, 113 W. Va. 135, 167 S. E. 89; *DeBerry* v. *DeBerry*, 115 W. Va. 604, 177 S. E. 440. See also 17 Am. Jur., Subject Divorce, Sections 248, 251. It is true that condonation is not relied on in defendant's pleadings, and it cannot be said that he otherwise relies thereon as a matter of defense to plaintiff's case; but I do not think his failure to do so precluded the court from refusing plaintiff a divorce, when the fact of condonation on her part clearly appears. It is settled law that in a divorce suit the State of West Virginia is an interested party. *Wass* v. *Wass*, 41 W. Va. 126, 23 S. E. 537; *Hall* v. *Hall*, 69 W. Va. 175, 71 S. E. 103; *Smith* v. *Smith*, 116 W. Va. 271, 180 S. E. 185. Divorces are not favored in law: *Crouch* v. *Crouch*, 78 W. Va. 708, 90 S. E. 235. Therefore, when it clearly appears from the record that the acts relied upon as grounds for divorce have been condoned by the injured party, a court should not enter a decree of divorce, even though defendant does not in his pleadings rely on such condonation as a defense. This view of the law is clearly upheld in *White* v. *White*, 121 Va. 244, 92 S. E. 811; *Williams* v. *Williams*, 152 Va. 896, 148 S. E. 579; 9 R. C. L. 346; 17 Am. Jur., Subject Divorce, Section 323, all cited in the majority opinion. In Section 323 it is stated: "It is generally recognized that condonation is an affirmative defense which the defendant cannot prove over the plaintiff's objection, unless such defense is specially pleaded or insisted upon in the answer. Although condonation is not specially pleaded or relied on as a defense the court may, in its discretion, and ordinarily is under a duty to, refuse to grant a divorce where it appears from the proofs, prop-

erly taken, that the injured party with a full knowledge of all the facts, has actually forgiven the injury, which has not been revived by subsequent misconduct. In order to guard against fraud or collusion in the exercise of its jurisdiction, the court, at any time before a final decree in the cause, if there is reason to believe such a defense exists, may ex officio direct an inquiry to ascertain the fact. This is because the interests of the public, as well as those of the individual parties, are concerned." I am, therefore, of the opinion that the plaintiff's condonation of the only ground for divorce legally established by her, bars any relief being decreed to her.

The next question is whether defendant, on his allegation of cruel and inhuman treatment, contained in his answer and cross-bill, and the proof adduced in support thereof, is entitled to a divorce. In this connection it is not improper to refer to parts of the majority opinion which, in my opinion, do not accurately state the grounds upon which the trial court granted defendant a divorce. At one point in the opinion, the Court says that, "According to the written opinion of the circuit court, made a part of the record, the court found that the plaintiff left home, deserting defendant, and on that fact alone plaintiff was guilty of cruel and inhuman treatment"; and at another point in the same opinion it is stated: "The opinion of the trial court was to the effect that defendant was entitled to a divorce on the ground of plaintiff's action in calling a moving van to the home and causing a portion of the furniture and personal effects therein to be hauled away to her apartment at 939 ½ Market Street, where she and her child took up their place of abode, was such inequitable conduct as would preclude plaintiff from obtaining a divorce. In the entry of the decree the trial court, as disclosed by its written opinion, evidently relied upon this ground and not upon the evidence bearing on plaintiff's actions in relation to other women." This is what the trial court actually stated as to his grounds for granting defendant

a divorce: "While there is no evidence before us to the effect that Mardell Cottle literally locked Justin Cottle out of his home, the record does show that without any notice to him and while he was at work at his office, she called a moving van to the home and hauled away a portion of his furniture and personal effects, taking them to an apartment at 939 ½ Market Street, where she and her child took up their place of abode. There is no convincing evidence to justify Mardell Cottle in such a course of conduct. Justin Cottle had provided a suitable and comfortable home for his wife and child. She left it without any good reason for so doing. This fact, *together with numerous other circumstances disclosed by the evidence,* (emphasis mine) convinces the court that Mardell Cottle was guilty of cruel and inhuman treatment toward her husband as alleged in his answer and crossbill." The majority opinion ignores the statement: "This fact, together with numerous other circumstances disclosed by the evidence", and does not, in my opinion, accurately picture the court's attitude in this case.

The ground on which I would sustain the action of the court in decreeing a divorce to defendant, on his answer and cross bill, is not plaintiff's action in leaving defendant's home, and removing certain furniture therefrom. I do not think that amounted to cruel and inhuman treatment. At most, it was desertion; and, the necessary time not having elapsed, there could, of course, be no decree for a divorce on the ground of disertion, nor is it so contended. In my opinion, defendant is entitled to a divorce on the grounds of cruel and inhuman treatment, growing out of plaintiff's denial of sexual relations, coupled with what I think the court would have been warranted in holding was the propensity of plaintiff to engage in improper and unnatural sexual relations with other women. I do not contend that the proof clearly shows that plaintiff has engaged in such relations; but I do contend that the evidence introduced on that point was sufficient to warrant the trial court in

finding that such inclination on her part was establish-
ed, and as a fair inference that it furnishes the true ex-
planation of her denial of sexual relations with her
husband.

It is well established in this State that denial of sexual
intercourse, of itself, is not sufficient to justify the
granting of a divorce. It is difficult to justify this rule
in all cases; but the right of a husband or wife to insist
upon sexual relations, as a part of the marriage relation,
is properly subject to so many exceptions, growing out
of health, mental attitude and other considerations, that
it would probably be unwise to make a change in the
general rule heretofore announced. I think, however,
that this Court has always held that where, without suf-
ficient reasons, sexual intercourse is denied, little else
is required to justify the granting of a divorce. The first
case in West Virginia on this question was *Reynolds* v.
*Reynolds*, 68 W. Va. 15, 69 S. E. 381, decided in 1910.
It was there held: "Neither the refusal of sexual inter-
course nor the fact that the parties occupied separate
houses or apartments, will alone constitute good grounds
for desertion"; and in the body of the opinion it is
stated: "Refusal of sexual intercourse is suggested.
This, if without sufficient reason, is wrong, but it is not
good ground for desertion as cruel and inhuman treat-
ment", citing cases from other jurisdictions. The next
case is *Wills* v. *Wills*, 74 W. Va. 709, 82 S. E. 1092, in
which Judge Poffenbarger followed the *Reynolds* case,
and answered criticism of that case. In the *Wills* case,
after referring in the first point of the syllabus to uni-
form and continued discourtesy of one spouse to the
other, manifested in various ways, it was held: "Nor is
such discourtesy combined with the exclusion of the hus-
band from access to the wife's bed and refusal of sexual
intercourse, while the marriage relation remains other-
wise unimpaired, ground for divorce." This is another
way of saying that such refusal "alone" is not ground
for divorce. The next case was *McKinney* v. *McKinney*,
77 W. Va. 58, 87 S. E. 928. In that case there was some

excuse shown for the wife's conduct. However, the *Wills* and *Reynolds*. cases, as well as *Crounse* v. *Crounse*, 108 Va. 108, 60 S. E. 627, were cited in support of the opinion.

It will be noted that the cases cited above refer to denial of sexual relations, as bearing on desertion; but in *Roush* v. *Roush*, 90 W. Va. 491, 111 S. E. 334, it was held for the first time that: "Nor is denial of sexual intercourse cruel or inhuman treatment within the meaning of the statute." When we read the opinion in that case we find that the circumstances of the case had something to do with the holding, although the *Reynolds*, *Wills* and *McKinney* cases are cited in its support. In *Croll* v. *Croll*, 106 W. Va 691, 146 S. E. 880, the rule is somewhat relaxed. There the Court held: "Though denial of sexual intercourse by one spouse with the other, without sufficient reason, does not alone constitute grounds for divorce, yet, where such unjustifiable denial of sexual relation is accompanied by unwarranted suspension of substantially all other phases of marital duty, the offending spouse is guilty of legal desertion, though the parties occupy the same house, and the spouse offended against is entitled to a divorce." In this case there was an attempt to justify the denial of sexual intercourse, which was not accepted by the court. The conduct of the wife as to meals, and other domestic services in the home, coupled with the denial of intercourse, was held to amount to desertion on the part of the wife. In this connection see *Perine* v. *Perine*, 92 W. Va. 530, 114 S. E. 871, where it was held that: "Legal desertion of one spouse by another is effected by willful, total and unjustifiable suspension of all marital duty and relationship even though both parties remain in the same house." In *Arnold* v. *Arnold*, 112 W. Va. 481, 164 S. E. 850, it is stated in the body of the opinion: " * * * but the denial of sexual intercourse alone is not considered legal cruelty," citing *McKinney* v. *McKinney*, *supra*. "But where the situation is extreme and there is as well a cessation of general marital duty, the offend-

ing party is guilty of desertion", citing *Croll* v. *Croll, supra.* In *Smith* v. *Smith,* 116 W. Va. 271, 180 S. E. 185, the rule in the *Reynolds, McKinney* and *Croll* cases is followed. In *Wolfe* v. *Wolfe,* 120 W. Va. 389, 198 S. E. 209, the latest case on the subject, it is stated in the body of the opinion: "Ordinarily, denial of sexual intercourse is not desertion or cruel and inhuman treatment". On this question see also 17 Am. Jur., Subject, Divorce and Separation, Sections 75, 108; 27 C. J. S., Subject Divorce, Section 32; I Bishop on Marriage, Divorce and Separation, Sections 1676, *et seq.* On unnatural acts see I Bishop on Marriage, Divorce and Separation, Sections 1829, 1830; see also 43 West Virginia Law Quarterly, 202-298.

I am of the opinion that the trend of the decisions of this Court on this subject is that, while it adheres to the holding that even unjustifiable denial of sexual relations is not, alone, suffiicient to entitle the injured party to a divorce, yet that fact, coupled with additional acts which are calculated to destroy the marital relation in its entirety, is sufficient to justify a divorce. I can conceive of nothing that would more tend to a disruption of all marital relations, than the unjustifiable denial of sexual relations between two people, in good health, and at an age when, in the course of nature, the natural sexual propensities are present, than a case where the denial of such relations is based on an unnatural propensity on the part of one to obtain his or her sexual satisfaction through relations with persons of the same sex. There is evidence here, which the trial court had the right to believe, that plaintiff more than once stated, in effect, that she did not enjoy sexual relations with her husband, and preferred woman to him. This, in my opinion, is the explanation of her refusal, over a long period of time, to engage in sexual relations with her husband. If the situation were such that denial of such relations was based upon conditions of health or even solely upon dislike of her husband, such refusal would not, under our decisions, be ground for divorce. On the other hand, any holding that a husband, of the age of

defendant in this case, must be deprived of the ordinary and normal relationship of marriage because of the unnatural sex propensities of the wife, which may reasonably be assumed as the basis of her refusal to conform to the usual and accepted duties of the marriage relationship, and have no relief against such a situation, cannot, in my opinion be defended. I think this situation, if it exists, and I think we may construe the trial court's finding to be that, in his opinion, it did exist, furnishes a sufficient basis for the court's decree in this cause.

I am not disturbed by the case of *Huff* v. *Huff*, 73 W. Va. 330, 80 S .E. 846. I am unwilling to follow the holding therein announced.

It may be said that there had been condonation on the part of the husband of denial of sexual intercourse. The husband lived with his wife long after such intercourse ceased, but he was protesting as late as December, 1943, and there is nothing in the record to show that he had full knowledge of the alleged unnatural sex propensity on the part of his wife. This was developed in the pending cause, and I do not think there has been any condonation on the part of the defendant.

We have often held that the holding of a trial court should not be disturbed unless plainly wrong, or without sufficient evidence to support it. This rule applies to divorce cases. *Hurley* v. *Hurley*, 127 W. Va. 744, 34 S. E. 2d 465; *Crouch* v. *Crouch*, 124 W. Va. 331, 20 S. E. 2d 169. Here, we have a holding of a trial court, upon highly conflicting evidence; and while the reasons for the court's finding are not specifically or distinctly stated, we are justified in upholding the decree, if, as to any ground for divorce, there is sufficient evidence to sustain that ground. Clearly, the trial Judge did not rely solely on what, in my opinion, amounted to an act of desertion; but he considered that in connection with what he terms "numerous other circumstances disclosed by the evidence", all of which convinced him that plaintiff had been guilty of cruel and inhuman treatment to-

ward her husband. In this I think he was correct, and I would affirm his decree.

I am authorized to state that Judge Haymond concurs in this dissent.